**Donald Wheeler JONES, Plaintiff,**

v.

**PUBLIC DEFENDER SERVICE OF the DISTRICT OF COLUMBIA, Defendant.**

Civ. A. No. 80–0623.

United States District Court,
District of Columbia.

Jan. 12, 1983.

Tilman L. Gerald, Leonard L. McCants, Silver Spring, Md., for plaintiff.

William J. Earl, Asst. Corp. Counsel, D.C., Washington, D.C., for defendant.

MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

The plaintiff, Donald Wheeler Jones, a black male lawyer, asserts that his former employer, the Public Defender Service of the District of Columbia ("PDS" or "Service") unlawfully discriminated against him because of his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, which resulted in his termination from employment following the filing of an Equal Employment Opportunity (EEO) complaint.

The Service, denying either discriminatory or retaliatory action, contends that plaintiff's allegations are totally unfounded and that he has not even succeeded in presenting a prima facie case of racial discrimination.

The cause was tried to the Court. Numerous stipulations were reached, witnesses testified, and substantial documentation was admitted into evidence.

For reasons demonstrated by the findings and conclusions of law noted within this Opinion, the Court concludes that plaintiff has not prevailed on his claim of racial discrimination and that judgment must be entered in favor of the defendant.

The Public Defender Service is an agency established by the Congress of the United States in 1970 for the purpose of providing equal representation in the District of Columbia, and primarily in the Superior Court of the District of Columbia, for persons financially unable to obtain adequate representation in criminal, juvenile and mental health proceedings. At relevant times herein it has been also responsible for assisting and consulting with the courts and the private bar in administering the assigned counsel program and, through its staff, has performed investigative services for the private bar. The staff of PDS, ranging from eighty to one hundred persons, includes attorneys, investigators, social workers, and administrative-clerical personnel. In addition, PDS employs part-time law student investigators and has, on occasion, operated programs for law student interns.

The powers of the Service are vested in a Board of Trustees which, at the time pertinent to this cause, was composed of seven members[1] with term of office limited to two consecutive terms of three years each. That Board is mandated to establish general policy for the Service.

The Board of Trustees is responsible for the appointment of both a Director and Deputy Director of the Service, each of whom serve "at the pleasure" of the Board.

> The Director shall be responsible for the supervision of the work of the Service and shall perform such other duties as the Board of Trustees may prescribe. The Deputy Director shall assist the Director and shall perform such duties as he may prescribe. The Director and Deputy Director shall be members of the Bar of the District of Columbia. D.C.Code 1981, § 1–2704.

In this litigation, the plaintiff has designated J. Patrick Hickey, Director of PDS during the period critical to this cause, as the alleged discriminating official. Mr. Hickey, a white attorney and member of the Bar of the District of Columbia, served PDS as its Deputy Director for three years, commencing in 1972. Thereafter he was appointed its Director, effective July 1, 1975.

An extensive nationwide search ensued to fill the Deputy Director vacancy created by Hickey's promotion to Director. Three Trustees constituted the Search Committee, chaired by then Dean Charles T. Duncan of the Howard University Law School. Several Trustees and Hickey, also, initially and openly supported other candidates, both black and white, as possessing superior qualifications to those of plaintiff. It was, however, Hickey, knowledgeable of Jones' race, who contacted Jones on his own initiative to explore and then develop his interest in the position. It was recognized that Jones had material deficiencies in that he was not current in the criminal law area, was unfamiliar with local law, practice, procedure and personnel, lacked supervisory trial experience, and was absent admission to the Bar of the District of Columbia. Nonetheless, Hickey expressed that Jones "could learn what had to be learned", necessary to satisfy the responsibilities of the post, could promptly remedy the existing problems, secure admission to the bar, master the case law, code provisions and District of Columbia procedural rules, and quickly seize the supervisory reins over both trial and administrative areas. Jones, after all, was not without impressive experience otherwise. A graduate of Howard University Law School, he had seven years of criminal trial experience in the private

1. Present composition is eleven of whom four are non-attorneys. D.C.Code 1981, §§ 1–2703(a), (b)(3).

practice of law and one year's service as a once-a-week municipal judge in Florida. For the seven years immediately prior to joining PDS he had been with the Community Relations Service of the Department of Justice, initially serving as Regional Director in Atlanta, Georgia and subsequently, as Deputy Director in the Washington, D.C. headquarters.

Accepting the recommendation of Hickey and the Search Committee, plaintiff was appointed on November 3, 1975, as the Service's third Deputy Director, and its first black in that position. Two years later, on November 18, 1977, defendant, asserting Jones' incompetence, terminated him from that position.

During the hiring interviews and repeatedly after he was employed by PDS, Jones was advised by Director Hickey that PDS's primary mission was to provide "first quality" representation to its clients, that Jones had to promptly seek admission to the D.C. Bar and, pending that, establish familiarity with the basics of criminal law practice and procedure in the District of Columbia as an absolute prerequisite to acquiring actual trial experience in its Superior Court in the representation of the clients served by PDS. It is self-evident, and constantly so conveyed to Jones, that he could only be valued as a supervisor of trial lawyers when possessed of these basic qualifications. To ready himself Jones was asked to immediately participate in the annual six-weeks' intensive training session which commencement coincided with his first day of entry on duty and which, among other matters, included not only active participation therein but also reading approximately 350 cases to provide the substantive foundation of criminal law in this jurisdiction as well as refresh his knowledge of criminal law in general. From this base, Jones could then begin acceptance of assigned cases in the Superior Court, gain local trial experience through direct representation of PDS clients, and thereafter supervise the other trial attorneys. As Hickey envisioned it, and as he expressed to Jones over and over again, the most important responsibilities of the Deputy Director were supervision and oversight of attorney performance in trials and appeals and supervision/participation in attorney training programs, including consultations with staff attorneys and other supervisors on issues of law, tactics and professional responsibility.

Jones candidly admitted at trial that he attended no more than two and one-half days of the first training session in November, 1975, and did not attend any of the sessions in 1976 or 1977 although urged to do so, that he did not read the 350 cases involved as part of that training, that he became a member of the bar of the District of Columbia only ten months later, by motion, in September, 1976, that he neither participated as counsel nor as co-counsel in any District of Columbia case, although Hickey continuously urged him to do so, that he remained essentially unfamiliar with the rules, practices and procedure of the Superior Court and that, at no time was he ever ready or able to supervise trial attorneys, even at the time of his dismissal from PDS two full years later. To excuse these derelictions, Jones recited his list of other activities, contending that the "staggering" volume of work delegated by the Director imposed an insurmountable barrier to scheduled accommodation of those essential work predicates.

It was Hickey's view, reflected in his drafting of the Deputy's job responsibilities, prior to Jones' selection, that the duties of the Director and his Deputy should be nearly interchangeable, consonant with equal talents and interests, and subject to frequent informal reassignment of tasks as needs required and circumstances warranted, similar to his own experience when Deputy to Norman Lefstein, Director. The latter two, and their predecessors, had successfully meshed their talents and stretched their resources in precisely this manner, while fully cognizant of the primary responsibilities for various areas being assigned to one or the other.

Fifteen items were specified under Job Description—Deputy Director (Pl's Exh. 8), some to be handled independently and oth-

ers to be coordinated with the Director or other supervisory personnel. Of these enumerated duties, several were assigned to and performed by Mr. Jones; others were not. While it had been intended that the Deputy would have primary responsibility for supervising and overseeing attorney performance in criminal and juvenile trials, appeals and mental health proceedings, supervision of and participation in attorney training programs (initial and on-going) and control of attorney workload, these activities were not delegated due to Jones' failure, heretofore explicated, to prepare himself to carry out these tasks. While Jones was requested to consult with staff attorneys and supervisors on issues of law, tactics and professional responsibility, and was available for these purposes, it is understandable, in light of his inexperience with the realities of District of Columbia practice, that no lawyer came to him for advice.

Hickey persuasively contended that in 1975 and 1976 he told Jones he was not assigning him additional responsibilities so that Jones would have ample time to devote to the task of familiarizing himself with the local criminal practice. Yet Jones admittedly did not do so even to the point of failing to attend, save rarely, the twice weekly PDS bag luncheons, the purpose of which was to share information on current court happenings, usually on a practical level.

Dissatisfied as he was with Jones' inability to perform substantively as contemplated, Hickey nonetheless delegated him to prepare memoranda for the staff on several issues of general interest and distributed other tasks to him.

Jones attended meetings of the Board of Trustees and prepared for its personnel his analysis of proposed speedy trial legislation, drafts of the Service's annual reports for fiscal years 1975 and 1976 and a draft of a proposed amendment to the Criminal Justice Act.

He participated in the hiring process and other personnel decisions, attended local minority recruiting programs (a matter of special interest to him), and did most of the out-of-town interviewing of attorney applicants in the fall of 1976. Indeed, plaintiff focused on this task to bolster his argument that the time devoted to recruiting precluded his accomplishment of other assignments. Although Jones interviewed 37 potential staff attorneys in his first two months (frequently 4–6 on the same day), Pl's Exh. 33, there remained ample opportunity to complete the basic requirements of his position should Jones have elected to so engage his time.

While recognizing that all activities are not necessarily noted, his daily office calendar reflected few other appointments, frequently listing no more than one conference or meeting for a specific date. Several days were absent any notation other than personal, such as dental appointments.

While unproductive to recite the parties' sparring on each activity Jones did or did not perform, the matter is readily clarified by several observations.

Finding Jones' performance of his administrative functions as unsatisfactory as his substantive preparation, Hickey emphasized Jones' shortcomings on his oversight of the non-legal supervisory staff of the Investigative and Offender Rehabilitation Divisions and his review of statistical data and record keeping practices in those Divisions.

As to the Investigative Division, Hickey had expressed concern to Jones about both the productivity of that Division and the quality of the work performed by the five full-time investigators. He asked Jones to review the statistical data to provide recommendations for a normal staff workload and, while monitoring the monthly reports, to suggest other means for evaluating the quantity and quality of the work. Six months later the information requested by Hickey as to success rate of timely completion was still not reflected on the monthly reports. Hickey spurred Jones to activity, but it took three separate written requests and nearly ten months before this statistical item began appearing on the Division's monthly reports. Even though Jones had suggested that he was requiring the super-

visor to monthly include an explanation for any deviation from the completion level of past years, as well as comments about the quality of the work, this was not done. Again time was engulfed before Hickey's suggestion to draft a brief questionnaire to the attorneys using the investigators' services, pending six months, was prepared by Jones and implemented for the Service's benefit.

Hickey discussed his concerns with Jones in December, 1976, advising that his performance was unsatisfactory, that it would have to improve markedly, and that he had either failed to complete or delayed too long in completing most tasks given. Jones assured Hickey he would do better but those assurances rarely produced the fruit of the promise.

In February, 1977 Hickey conducted his own review of the Division's statistical records. Shocked to discover that most of the investigators appeared to be generally doing a totally inadequate amount of work (*e.g.* contacting only two or three witnesses in a 40-hour work week) he advised Jones of his findings and demanded improved productivity in the Division. Under Jones' administration the problems continued.

Similarly, Jones had been directed in early 1976, and subsequently, to devise methods to evaluate the work of the Offender Rehabilitation Division and a work plan. Months went by with promises of action from Jones but no results. Nine months later Jones advised that he and the Division's Chief had "basic questions" about the purpose of the evaluation. Jones' proposal, approximately one year after the initial request, was deemed unsatisfactory.

These illustrations, only two of many credibly detailed at trial through testimony and documentation, reflect Hickey's accelerating frustration and assured perception that Jones consistently demonstrated an inability to perform, in timely and appropriate manner, the duties of his position.

> . . . Work which he has completed has been all too often characterized by an absence of careful thought, judgment, or independent responsible consideration of the project before him (e.g., his consistent delegation of his duties to other subordinates, and his unquestioning acceptance of their reports to him). His failure to prepare himself to discharge adequately the highly important duty of working with the staff attorneys reflects a particular lack of diligence, especially in light of the readily accessible opportunities available to him here.
>
> My discussion has focused mainly on Mr. Jones' failure or inability to perform even routine tasks, but it should not be overlooked that I was also requesting from him some creative thinking and judgment, of a quality reflecting the executive nature of his position and his compensation. Satisfactory responses to these requests (e.g., in devising methods for monitoring the productivity of the investigators, or in identifying appropriate factors for evaluating the Offender Rehabilitation Division) were simply not forthcoming.

Def's Exh. EE, containing Hickey's letter of Sept. 2, 1977 to the Chairman of the Board of Trustees, at 16.

Since fall 1976, Hickey had periodically expressed not only to Jones but also to the then Chairman of the Board of Trustees his concern and dissatisfaction with the quality and quantity of plaintiff's work performance and persistent failure to prepare himself for assumption of the tasks awaiting delegation to him. Nevertheless, Hickey gave constant extensions to Jones for completion of assignments and provided innovative suggestions for material resolution of chronic problems. By June 1977, however, Hickey verbally suggested to Jones that he consider seeking other employment.

Plaintiff's response to criticism of similar vein, which had been frequently imparted verbally and through writing, was to request on July 1, 1977, for the first time in his tenure at PDS, and without specificity, that Hickey "prescribe duties for me . . . which are in accord with my job description . . . ." (Def's Exh. I). Noting his interest in succeeding Hickey as Director, when Hickey left the agency, Jones observed that "it

is obvious that much, if not most, of what you are doing should have been done by me." Alluding to their various discussions on this point, Jones proffered his belief that the "frustration generated by your workload has a deleterious effect on our ability to function together."

On July 6, 1977, twenty months after accepting the Deputy's position, knowing Hickey's expectations from the outset, but blithely ignoring his own inadequacies, Jones addressed Hickey again on "Making the Transition to the Full Deputy's Duties" by reassigning certain delegated tasks "because I will suggest hereinafter a light caseload for myself ..." having decided, now, that "I should become familiar with the kinds of records, files, indicators and guidelines that are used by the supervisors," and suggesting a caseload of four cases since "ultimately, the only way to get oriented to criminal cases in Superior Court is to begin doing some."

Another memorandum to Hickey, also dated July 6, 1977 (attached to Pl's Exh. 25) and captioned "Possible Effects and Perceptions Within the Agency" was viewed by Jones, its author, as

> ... *not intended to be, nor are they accusatory.* Rather, I view them as an opportunity for us to be introspective and sensitive about our actions, inactions, and attitudes as they may bear upon employee relations generally, and their possible effects upon minority employees in particular. [Emphasis supplied.]

He stated he merely wanted to examine "a failure on our part, *despite prodigious efforts,* to significantly increase our hiring of minority professionals ...". (Emphasis supplied.) Referencing the duties of the Deputy Director, Jones noted that

> ... Obviously, if a person who is also black is not performing the same duties performed by the former deputies at the agency who were white, there is a danger that the staff may reach the conclusion that the differences in assignment of duties is based upon race. *I disclaim any belief that this is true now as I did to you personally during our conference of July 5.* Still, the possible perception and effect remains and needs to be dealt with promptly as I have said previously. [Emphasis supplied.]

He concluded his 13-page memorandum:

> I may be entirely wrong in my conclusions. There is probably quite a reasonable explanation. I assume there is, of course, you have no obligation to give any. I am quite willing to work with you and implement your policies in any event, but I trust you can understand how the dispelling of some of these perceptions would help me considerably.

Since the beginning Hickey had been aware that he was shouldering too many PDS burdens due to Jones' adamant refusal to prepare himself to accept those very burdens Hickey wanted to release to him. Assuming accurately that Jones was now seeking duties related to trial attorney experience, absent any effort to construct the requisite foundation, and noting that Jones wanted to even shed some of those duties he should have been able to perform presently, and assume a "light" caseload for himself, Hickey responded, on July 14, Def's Exh. K, that

> As you are aware, I have been most dissatisfied with your performance of your duties to date and do not feel that you are presently qualified to supervise trial attorneys. It is my view that the assignment of additional duties to you at this time would not be in the best interests of the Service.

While Jones admitted, with refreshing candor, that he would *not* have been ready to supervise trial attorneys in July, 1977, he nevertheless reacted strongly to Hickey's declaration of this inability.

The next day, July 15, 1977, plaintiff, for the first time, levied an accusation of racial discrimination against Mr. Hickey.

> The almost completely incredible circumstance is that you have chosen to conclude without prior consultation on the matter with me and without ever giving me the opportunity to perform the duties my job description calls for, that I am not "presently qualified to supervise trial attorneys."

As much as I have tried to avoid the conclusion, I can no longer avoid the conviction that your extraordinary exercise of bureaucratic power to deprive me of even the opportunity to perform in accordance with my job description is based upon racial or racist motivations.

I hereby officially charge you with racist motivations in your attitudes, executive decisions, and assignment of duties to me.

Still, Jones suggested possible resolution of these matters, failing which he demanded a full hearing on the matter before the Board of Trustees five or more weeks later, following his vacation.

On July 18 Jones amended his original allegation of racial discrimination by an "Additional Complaint", without particulars, charging Hickey, throughout his tenure as Director of PDS, with racist policies, procedures and judgments resulting in "institutional barriers" and "institutional racism" concerning the employment of minority professionals.

Memoranda flowed during August and September 1977, both Hickey and Jones urging the Board of Trustees to give the matter its careful evaluation.

Represented by counsel, and pursuant to the Service's Equal Employment Opportunity Plan, Mr. Jones submitted a written memorandum to Director Hickey expressing his position and asking the Board to consider the points he raised. Since, under § 2–2224, District of Columbia Code, the Director and Deputy Director of PDS are appointed and removable by the Board of Trustees, it was appropriate that any allegation of discrimination in the relationship of these two officials should be considered by the Board promptly and directly. This was done on August 30, 1977. Both Jones and Hickey were asked to submit additional information concerning those duties Jones had requested and been denied, Hickey's judgment, and the basis therefore, as to why Jones was not qualified to perform duties that had not been assigned, and a description of the precise action Jones requested the Board take to resolve his complaint. Following these responses the Board met again and subsequently requested further information, setting another special Board meeting for September 23.

Hickey advised the Board of his recommendation that Jones be relieved of further responsibilities since, although repeatedly warned of the need for improvement for more than one year, his performance of duties had neither improved nor been performed in a competent manner.

Jones declined the invitation to meet with the Board of Trustees on October 7, 1977, when advised that the Board might then address whether Jones should continue at PDS or be discharged from the Service, since he felt informal resolution of the complaint appeared "unlikely". He notified the Board, through counsel, that he was filing a formal complaint of racial discrimination with both the District of Columbia Office of Human Rights and with the Equal Employment Opportunity Commission, a matter done on October 5, 1977, while the case was pending the Board's action, and more than one month after the Board, at the mutual request of Jones and Hickey, commenced consideration of his problem.

On October 7 the Board met as scheduled and, *inter alia,* heard from and made inquiries of Mr. Hickey concerning his recommendation that the Deputy Director be terminated due to unsatisfactory performance. In executive session with six of the seven trustees present, including three black male attorneys, the matter was discussed. One attorney-trustee left before the affirmative, unanimous vote that "Mr. Jones' charge of personal discrimination against him by Mr. Hickey is not supportable." Consideration of Hickey's recommendation that Jones be dismissed was deferred until the Board's next meeting on October 20. Def's Exh. OO. On October 20, the two earlier absent trustees indicated their agreement with the previous action of the Board which thereupon acted affirmatively, 6–1, on the recommendation to terminate Jones' appointment as Deputy Director, effective November 18, 1977.

One and one half years later the Office of Human Rights rendered a determination that there was probable cause to believe that the Public Defender Service had engaged in racial discrimination against plaintiff. EEOC subsequently issued plaintiff his notice of right to sue.

In this litigation, plaintiff seeks restoration to his former position with defendant agency as its Deputy Director, back pay, injunctive relief, costs and attorneys' fees.

Asserting the defendant racially discriminated against him not only as to "terms, conditions and privileges of employment", but also as to his "compensation", see Complaint ¶ 7, plaintiff subsequently clarified and altered his position. He explained the alleged disparate compensation as: "spiritual, psychic and ego-related in that plaintiff was not allowed the normal compensation of knowing that he was participating fully in performance of the duties that he was hired to perform", Pl's Ans. to Def's Interrogatories, No. 7. Hired at a salary of $37,800 per year, benefiting from at least two cost-of-living increments during his tenure as Deputy Director and terminated when earning $46,400 annually, Jones withdrew, at pretrial, his claim of discrimination as it related to his compensation.

He also conceded that he, second in rank at PDS, could not, and did not, contend denial of promotion, acknowledging the absence of a vacancy in the Directorship.

It is then of interest to observe that, although the two deputy directors preceding plaintiff were both white males, the deputy director succeeding Mr. Jones was Francis D. Carter, a black, who, in turn, upon the later resignation of Hickey, succeeded him as Director.

Clear and convincing testimony, noted above, has demonstrated why Jones did not receive the full duties performed by prior deputy directors. Although the whole complement of responsibilities awaited passage to him from the outset of his career with PDS, the agency's best interests required Jones to first fortify his foundation with basic, indeed essential, substantive and procedural skills. Until the angry communications commencing July 1977, Jones understood fully that logic, acknowledged his lack of preparedness and affirmed that much remained to be done by him. Yet, in a sweeping indictment, Jones averred that the policies, practices, prerequisites, procedures and criteria maintained by the defendant created an atmosphere of racial discrimination, Complaint ¶ 10, citing, among other allegations, his perception that he did not receive assignments exercised by his two white predecessors. See Pl's Ans. to Interrogatories, No. 8a–d.

Examination, briefly, of but a few contentions, promptly demonstrates the invalidity of other allegations of like character.

Apparently overlooking the fact that he as Deputy, and second in command at the agency, bore overall responsibility and could not therefore be likened to "other supervisors", Jones still protested that his monthly activity reports were more detailed than those of "white supervisors".

Although the original charge of racial discrimination against Hickey contained no allegation of any kind regarding discrimination in the hiring of minority professionals, this charge was added three days later by an "Amended Complaint".

Stating the fact that white attorneys predominated and black personnel filled the bulk of non-professional positions, Jones and several of his witnesses criticized Hickey for "refusing to adopt criteria" to recruit black attorneys primarily on a local, rather than national, basis. Understandably concerned that qualified black professionals were not rapidly increasing at PDS, and quarrel as they did with criteria utilized by the agency in its recruitment efforts, even the most zealous did not characterize the criteria, the agency's practices, or Hickey, as "racist", or "prejudiced". As an example, Michael Rankin testified that he had sought but not been appointed to the Deputy's vacancy, but still was asked to increase the number of qualified black attorneys in PDS, that there was at least one black attorney on each hiring committee during his several years' tenure there, that "I can-

not delineate any clear racial prejudice from Hickey's actions," that "I enjoyed a very good relationship with Pat", and that Hickey and the Board "gave the general impression and articulated a great concern" for increasing the number of blacks on the staff. He also observed that "our staff attorneys were more familiar with Superior Court practice than Jones . . . who was still in the learning stages of his job".

Francis Smith, who worked for PDS from 1973 to March 1976, vehemently disagreed with the hiring criteria emphasis on quality "law schools rather than skills." Nonetheless, he would not label this criteria "racist" nor did he see it as evidence of racial predisposition. While free to do so, he did not consult Jones concerning trial strategy since Jones did not know about Superior Court trial work. He did, however, confer several times with Hickey, when he was Deputy Director. Smith "thought" PDS treated white applicants differently than blacks, but admitted he never viewed the issue as racial, suggesting instead it was a "socio-economic problem."

Other witnesses criticized PDS' perceived lack of sensitivity and success in recruiting at "elite" schools rather than local ones. The fact is PDS, and Jones himself, recruited vigorously at several local schools, including Howard, and others with predominantly black student population.

Defendant's witnesses, including Hickey and members of the Board of Trustees, credibly defended the charges. Those involved in the process had realistically, but helplessly recognized for some time that highly qualified black attorneys, eagerly sought by PDS, were rejecting PDS' work offers in favor of employment with large, prestigious law firms which offered substantially augmented monetary and supplementary benefits not available to any staff attorneys at PDS, white or black.

Hickey had "frequently solicited Mr. Jones' thoughts and suggestions on minority recruitment since he came here [but] he has contributed little or nothing in the way of ideas regarding this important program." That program, the subject of the Trustees' concern and discussion over many years, consisted of techniques substantially unchanged for five years and obviously used prior to Jones' involvement with PDS. New methods were those suggested since by Hickey, which efforts included:

> (1) Obtaining minority enrollment data at ABA-approved law schools and utilizing it in selecting the schools at which we schedule interviews and where we send recruiting materials;
>
> (2) Utilizing PDS employees who are law students active in the Black American Law Students Association to make contacts with other BALSA chapters and sending recruiting materials to those chapters;
>
> (3) Writing in advance of our visits to minority organizations at the law schools where we recruit;
>
> (4) Contacting law school faculty members to seek out minority students;
>
> (5) Hiring minority students as summer employees at PDS; and
>
> (6) Urging minority staff attorneys to contact appropriate persons at each of their alma maters to solicit minority applications.

(Def's Exh. DDD, at 9).

During the four hiring cycles while Jones was at PDS, certain procedures were in effect. The Director screened the applicants' resumes, decided who would be interviewed by both Hickey and Jones and determined thereafter whether the applicant should be further interviewed by a committee of staff attorneys. Jones never took advantage of the continuing right to refer an applicant to the hiring committee even though that person had not also been selected by Hickey. Following the full interview process, Jones and Hickey discussed the candidates. Jones and each of the hiring committee members, some of whom were black attorneys, gave a written "order of preference" listing. Prior to his charges of racial discrimination, no minority applicant recommended by Jones for hiring failed to receive an offer from the Service. This charge is best summed by Jones' own reflection in his July 6, 1977 "Perceptions" communication to Hickey:

I must add that I believe your efforts to recruit minority applicants have been continuous and commendable.

In sum, the Court cannot be oblivious to the chronology of the facts. On June 23, 1977 Hickey gave Jones a detailed criticism of his work with the Investigative Division and suggested he consider other employment. Prior to that time, Jones had not requested the assignment of any other duties or complained of those which had been assigned. Jones had never suggested to Hickey that he felt that he or any other PDS employee was being discriminated against on racial grounds.

Quoting Jones' July 1 reference to "possible perceptions" which might arise from his supervision primarily of black employees, Hickey had specifically asked him, in a meeting July 5, whether he felt that Hickey had failed to assign duties because of racial bias against him. Jones denied any such belief, asserting it would be "ridiculous" for him or anyone to think Hickey was racially biased. Jones confirmed this in writing in his July 6 memorandum,

> [T]here is a danger that the staff may reach the conclusion that the differences in assignment of duties is based upon race. I disclaim any belief that this is true now as I did to you personally during our conference of July 5.

Discussing the agency's practices towards increasing the hiring of minority professionals, Jones termed PDS's efforts as "prodigious."

Nine days later, and only one day after Hickey rejected his request for "full" duties, Jones accused Hickey of racial discrimination. In an afterthought three days following, he castigated the Public Defendant Service for its "institutional racism". Mr. Jones has been afforded a full opportunity to pursue his complaint of racial discrimination with its averments of selective enforcement and disparate treatment.

Title VII of the Civil Rights Act of 1964 prohibits the discriminatory treatment of any employee because of "such individual's race", Section 703(a)(1), 42 U.S.C. § 2000e-2(a)(1).[2]

Supporting the foundation of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its fertile progeny[3] in continuing "to elaborate and refine the substantive nature of the Title VII intentional discrimination claim and its means of proof by indirect or circumstantial evidence", *Lovelace v. Sherwin-Williams Co.,* 681 F.2d 230, 238 (4th Cir. 1982), the Supreme Court recently restated the allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

To provide a "sensible, orderly way to evaluate the evidence", *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1976), the plaintiff must first succeed in proving, by a preponderance of the evidence, the essentially simple but mandatory prima facie case, which creates the rebuttable presumption of unlawful discrimination.

Those elements of a prima facie case of racial discrimination require a plaintiff to show:

(i) that he belongs to a racial minority;

(ii) that he applied and was qualified for a job for which the employer was seeking applicants;

(iii) that, despite his qualifications, he was rejected; and

2. Section 703 of the Act, 42 U.S.C. § 2000e–2, provides in pertinent part:

"(a) Employer practices. It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

3. Foremost, among others, *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

(iv) that after his rejection the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6, quoting *McDonnell Douglas.*

Acknowledging these criteria must adapt to particularized situations, as here, the Court has noted that *McDonnell Douglas'* elements for a prima facie case demonstrate a model only, "not necessarily applicable in every respect for differing factual situations." *Id.* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13; *Burdine,* 450 U.S. at 253–54 n. 6, 101 S.Ct. at 1094 n. 6.

While *McDonnell Douglas* was a hiring case, its four factors for establishing a prima facie case have been extended to discharge situations. *Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207. This plaintiff must show:

(i) that he belongs to a racial minority, that is, to a group protected by the statute;

(ii) that he was qualified for the position in which he was singled out for adverse treatment, or in any event treated adversely in his employment, while others, who had been similarly situated, were dissimilarly treated;

(iii) that he was terminated; and

(iv) that after his termination, the employer hired a person who had comparable or lesser qualifications, not in plaintiff's protected class.

*See McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Whiting v. Jackson State University,* 616 F.2d 116, 121 (5th Cir.1980); *Long v. Ford Motor Co.,* 496 F.2d 500 (6th Cir.1974).

For most plaintiffs it is not difficult to establish a prima facie case. But Jones can fully meet only two of the essential elements for a prima facie case, (i) and (iii); he satisfies (ii) with modifications, but can not make a prima facie case as to the fourth and final element.

Mr. Jones, black, is, of course, a member of the protected class. He was not qualified for the position of Deputy Director at time of hiring; nonetheless, because Jones had been apprised that it was expected that he could, and would, promptly remedy the deficiencies, the fact of his employment as Deputy with his employer's full knowledge and acquiescence in his lack of even minimal qualifications, allows traversal of this second element of the prima facie threshold.

In *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396, the Supreme Court stated:

> 'Disparate treatment' ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. [Citation omitted.] Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII ....

Plaintiff contends he was singled out for adverse treatment and treated worse than others similarly situated, not of the protected class. His two predecessors, of whom the most recent was Hickey, were both white, and therefore not of the protected class.

Either the designated duties were never given Jones or, in increasing degree, were removed; subsequently Jones was terminated from employment. Neither of his predecessors was similarly "disciplined" or terminated. On the contrary, when his Director left the agency, that Deputy became Director. It is evident from the recitation above that Jones fully understood, from the very commencement of his employment, that there were basic matters to be accomplished, that the opportunities were readily accessible, that only he could avail himself of this preparation, that other assignments were being deferred or eased so that Jones could quickly become the Deputy Director

in the fullest sense of that position, that he was constantly encouraged, urged, prodded and implored to become fully qualified for his work. It was but a few days prior to his only allegations of racial discrimination that Jones asked for duties additional to those he presently exercised, or all duties listed on the job position. Even then as he admitted at trial and as those angry memorandums reflect, he recognized he was not ready to assume all those responsibilities. It ill behooves plaintiff then to complain of results generated through his self-imposed inactivity.

For the fourth and last element of establishing a prima facie case it would have been sufficient for Jones to show that the available position was filled by an individual with comparable, or lesser, qualifications who was not a member of the protected class. *Garner v. Boorstin,* 690 F.2d 1034, D.C.Cir., 1982, at 1036 n. 4; *See Banerjee v. Board of Trustees,* 648 F.2d 61, 62 (1st Cir.), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981); *Kunda v. Muhlenberg College,* 621 F.2d 532, 545–46 (3rd Cir.1980). Here, after plaintiff was terminated as Deputy Director, he was succeeded by a qualified black male who, following Hickey's later resignation, became Director of the Public Defender Service.

Plaintiff has not carried his burden of establishing a prima facie case. Proving the four elements of that case "serves the important function of eliminating the two most common non-discriminatory reasons for an employee's rejection—lack of adequate qualifications and lack of job opportunity." *See Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1093–94, *Garner v. Boorstin,* at 1036.

Plaintiff's failure, then, should end this considered inquiry. But, were the Court to accept Jones' premise that he was treated unfavorably to others similarly situated and that, somehow, he has made a prima facie case, it is nonetheless concluded that he is not entitled to relief.

With the establishment of a prima facie case, the burden shifts to the employer "to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate discriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. *Board of Trustees v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. The burden imposed on the employer is not "to introduce evidence, which, in the absence of any pretext, would persuade the trier of fact that the employment action was lawful", but only to "articulate lawful reasons for the action." *Id.* at 257, 101 S.Ct. at 1096.

Here, the defendant has vigorously rebutted the presumption of discrimination by clear and convincing articulation of the reasons for its actions both in withholding assignments and subsequently terminating Mr. Jones from his employment with PDS. The production of evidence has been emphatic and overwhelming.

The delineated facts give forceful justification to the employer's decision of termination. Mr. Jones ill performed the assignments given and failed to build the groundwork for the assignments his Director wished to give him. Jones bore the ultimate responsibility to perform all his duties, to recognize mounting difficulties, to supervise appropriately, to follow explicit directives and to defuse accelerating explosions. But instead, scorning help and ignoring warnings, he did little or nothing when alerted to impending problems. Although readily assuring improved performance, through inaction he refused affirmative response to his supervisor's importuning to shift the collective burdens from Director to Deputy Director.

As a result, Jones' assigned duties were first limited and subsequently decreased. Still, Jones refused to abandon his self-destructive course which inevitably, by a reasonable employer's response, led to eventual termination of his employment. His deficiencies of performance, through omissions

and inadequacies, casually dismissed by him but found flagrant by his employer, could well comprise the legitimate, non-discriminating grounds for both non-assignment of duties and later dismissal from the Service. This employer has met his burden of articulating, by admissible and credible evidence, a lawful reason for its act; "the presumption raised by the prima facie case is rebutted." *Id.* at 256, 101 S.Ct. at 1095.

Plaintiff has not demonstrated, as he must to prevail, "... that the proffered reason was not the true reason for the employment decision," that is, was a pretext for the discriminatory reasons for employment treatment, including dismissal. *Id.* Here, the burden of persuasion rests on the plaintiff who, however, is not required to introduce new evidence. *Id.* n. 10. Plaintiff has not met his burden.

It is obvious that given repeated opportunities to respond to the unfavorable situation, despite requests and then demands that he comply with directives, confronted with his shortcomings and inability to handle the system, plaintiff continued to ignore known problems, blinking at reality as the deficiencies magnified, offering excuses, attributing blame to others and never acknowledging the fault as his.

It is regretful that plaintiff, with his otherwise recognized competence (which hoisted him to the position in the first instance in the hopeful expectation he "could learn what had to be learned") simply did not do the job as mandated. The results generated by his failures demanded his best remedial efforts. He would not apply rapid and rigorous measures and accordingly failed to rectify the situation. As a consequence, the actions exercised toward plaintiff by PDS and Hickey, and his subsequent termination reflect a sound employment decision with business justification. *Ste. Marie v. Eastern R.R. Ass'n,* 650 F.2d 395 (2nd Cir.1981).

There is no evidence here of retaliation, racial overtone or animosity, and no evidence to indicate that the employer's motivation was, even in some part, racial. Under the circumstances, neither demonstrating selective enforcement nor proscribed disparate treatment in employment, Mr. Jones' claim of discrimination based on race, and accompanying claim of "institutional racism", wholly lacks merit, demanding judgment for defendant.