William S. HARDY, Plaintiff,

v.

MARRIOTT CORPORATION, Defendant.

Civ. A. No. 81–2030.

United States District Court, District of Columbia.

May 1, 1987.

---

Carlton J. Trosclair, Holly A. Silver, Marriott Corp., Bethesda, Md., for defendant.

Harry T. Alexander, Washington, D.C., for plaintiff.

THOMAS F. HOGAN, District Judge.

## MEMORANDUM OPINION

Plaintiff, a black male, brought this action claiming disparate treatment based on race in the conditions of his employment, his performance evaluations and his eventual discharge by defendant Marriott Corporation ("Marriott" or "the corporation") in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. This case was tried before the Court, without a jury, over an eleven day period. At the conclusion of the trial, the Court requested the parties to submit proposed findings of fact and conclusions of law. The Court took the matter under advisement and herein issues its findings of fact and conclusions of law. Upon lengthy and careful consideration of all the evidence, the Court finds that plaintiff has failed to meet his burden under Title VII.

## FINDINGS OF FACT

Plaintiff William Smith Hardy was hired by defendant on March 28, 1973, as a Personnel Director for the Twin Bridges Marriott Hotel ("Twin Bridges") in Arlington, Virginia. As a hotel personnel director, plaintiff was responsible for recruitment, orientation programs, benefits and insurance administration, employee and labor relations, implementation of corporate policy, and maintenance of records. Plaintiff was a unit level manager and as such was a member of the executive committee which oversaw the daily operations of the hotel. During his tenure at Twin Bridges, Mr. Hardy was the only black individual on the seven man executive committee. Within the Marriott heirarchy, plaintiff reported to Terry Barlow (white male), the General Manager, later succeeded by Thomas Gowman (white male), and to Robert Hill (black male), the Regional Personnel Director responsible for, among others, the Twin Bridges Hotel. Mr. Hill reported to James Ward (also known as Bud Ward) (black male), Vice President of Personnel, who in turn reported to James Durbin (white male), President of the Hotel Division.

## A. The Interview

Plaintiff initially interviewed with Terry Barlow for the personnel director position at the Twin Bridges property. At the conclusion of the interview, Mr. Barlow offered plaintiff the job and Mr. Hardy accepted. Several days later, Robert Hill and another Regional Personnel Director, a white male, met with plaintiff in what appeared to be a second interview. All the two men knew about plaintiff, though, was that he was to begin work the next day. During the meeting plaintiff seemed agitated and annoyed. He became increasingly hostile towards the white Regional Personnel Director, at which point Mr. Hill asked Mr. Hardy how well he worked with white people in the sense of supervising them. Mr. Hill also inquired about plaintiff's family, a question plaintiff found inappropriate in a business meeting. During his two years at Twin Bridges, Mr. Hardy took great offense at any questions concerning his family, despite the friendly nature of the inquiries.

## B. Plaintiff's Performance

Periodically the General Manager of a Marriott hotel conducts a review of an employee's performance, setting forth the individual's strengths and weaknesses. On September 20, 1973, Mr. Barlow evaluated plaintiff, in a Personnel Action Form ("PAF"), rating him above average but noting that in the future Mr. Hardy must complete assigned tasks in a timely fashion, learn all personnel policies and procedures, and conduct himself in a gentlemanly manner at all times. On October 23, 1973, Mr. Barlow issued a Management Performance Appraisal on plaintiff which advised Mr. Hardy that he needed to promptly complete work assignments, learn to anticipate project complications or problems, carry out instructions reliably, reduce employee turnover, and aid employees and management in better training programs.

On September 24, 1974, Mr. Barlow sent a memorandum to Thomas Gowman, his successor as General Manager, listing the strengths and weaknesses of Mr. Hardy.

Since Mr. Gowman had been at the Twin Bridges facility for only a short time, he needed some basis for completing a PAF on plaintiff and, therefore, requested evaluations from Mr. Barlow and Mr. Hill.[1] Among his strengths Mr. Barlow noted that plaintiff displayed excellent loyalty to the General Manager, worked long hours, and had won the respect of the vast majority of employees throughout the hotel. His weaknesses included occasional temperamental behavior, untimeliness in completing reports, and an aversion to handling the administrative tasks of his job. Mr. Hardy denied that he displayed any of the weaknesses Mr. Barlow attributed to him, although he does not claim that Mr. Barlow discriminated against him.

On September 25, 1974, Mr. Hill, too, wrote an evaluation of Mr. Hardy for Mr. Gowman. Mr. Hill found that plaintiff's problems included an inability to perform consistently, hypersensitivity, and failure to undertake necessary personnel services such as recruiting new employees, staffing the property, or initiating employee meetings. In addition, Mr. Hill credibly testified that a full property audit with Mr. Hardy had not been possible as plaintiff was always too unprepared to conduct such an audit with Mr. Hill. Despite many meetings with Mr. Hill, plaintiff never complained to him or sought guidance about audits or work problems. On October 3, 1974, Mr. Hill again addressed a memorandum to Mr. Gowman suggesting that plaintiff be directed to develop a three-month Plan of Action and a one-year Personal Plan to improve his performance.

On October 9, 1974, Mr. Gowman gave plaintiff a performance review, adopting the evaluations of Mr. Barlow and Mr. Hill and directing plaintiff to put together the performance improvement plans suggested by Mr. Hill. Mr. Gowman informed plaintiff he would have to "adopt more of the traditional role of a Director of Personnel in a hotel situation and concentrate more on serving the management's personnel needs in following through on corporate employee programs." Def. Exh. F. Mr.

---

1. Mr. Gowman had 12 years of experience as a general manager.

Gowman gave plaintiff an "above-average" rating partly in acquiescence to Mr. Hardy when plaintiff objected to the suggestion that he deserved a lower rating. Mr. Hill testified that he recommended an above-average rating for plaintiff because plaintiff indicated he needed a ten percent pay increase; an above-average rating was generally a necessary prerequisite to such an increase. Mr. Hill sought to appease Mr. Hardy as the relationship between the two men had been somewhat antagonistic.

Plaintiff failed to submit a Plan of Action pursuant to the October 9, 1974 PAF. The exhibit plaintiff offered at trial as proof that he did submit a Personal Plan relates to Fiscal Year 1974 and not Fiscal Year 1975, as required by the October, 1974 PAF. The document is an apparent attempt by plaintiff to assert he prepared the Personal Plan although it is inherently incredible, as are plaintiff's explanations.

At trial plaintiff denied that his performance warranted the negative evaluations he received. Plaintiff pointed to numerous programs in which he was involved to establish that his performance as Personnel Director was above average. To provide open communications between management and employees, for example, plaintiff organized a program entitled "Rap It To The Man." This program built on and improved the system already in place for exchanges between management and employees. Similarly, Mr. Hardy also assisted in the Employee Opinion Surveys conducted at the Twin Bridges property on June 6, 7, and 8, 1973 and June 5, 6, and 7, 1974. Although he contributed to the high response rate of the surveys, the evidence demonstrated that plaintiff was not solely responsible for the success.

While at Marriott Mr. Hardy tried to alleviate the inordinate amount of paper work accumulating at the property. He also enthusiastically attempted to recruit first offenders for employment at the hotel and actively sought the career progression of minorities and women. Mr. Barlow testified, however, that plaintiff "appeared overzealous to promote people into jobs that others didn't think they were really competent or qualified for, and that required the approval of Mr. Hill, Mr. Ward and others." [2] 4/28 Trial Transcript at 8.

During his last two months as Personnel Director at the Twin Bridges hotel, plaintiff devoted a substantial amount of his work day to personal activities. Testimony revealed that plaintiff was engaged in establishing his own business.

### C. Train-The-Trainer Program

During the course of his employment at Marriott, the corporation held a seminar entitled "Train-The-Trainer." Plaintiff was assigned to attend the program when it was offered in the District of Columbia. Mr. Hardy, believing he had nothing to gain from the program, failed to attend. He was then ordered by Mr. Hill well in advance to attend the same seminar in Dallas, Texas. Plaintiff never told Mr. Hill he would not go. George Washko (white male), the Regional Vice President, expected plaintiff to be in Dallas for the training program. When plaintiff was not present the first morning of the Dallas seminar, Mr. Gowman received a call from corporate headquarters directing him to tell Mr. Hardy that he was ordered to fly to Dallas for the balance of the program. Mr. Gowman passed the message on to plaintiff, but Mr. Hardy chose not to leave as it was already 10:00 A.M. and the next flight for Dallas left at 11:00 A.M. Plaintiff failed to attend either day of the two-day training session in violation of the direct order to do so.

### D. Alleged Incidents of Racial Slurs

Part of plaintiff's Title VII action rests on his charge that he was subjected to racial jokes and slurs. Plaintiff's evidence revealed that on three separate occasions, a member of the executive committee told racial or ethnic jokes in plaintiff's presence.

---

**2.** Although Mr. Hill informed plaintiff that he should not send resumes to him, Mr. Hardy continued to forward resumes and recommendations to Mr. Hill. Occasionally Mr. Hill would interview the applicants Mr. Hardy recommended, or send them to the appropriate hiring authorities.

Plaintiff, though, responded in kind with ethnic jokes. Plaintiff further claims that Mr. Hill called him his "Star Nigger" or "Super Nigger." Mr. Hill testified that he had on occasion used the term "Super Nigger" in speaking with plaintiff, but that Mr. Hardy had initiated the use of this phrase and continued to do so in conversations. Although plaintiff also claims that Mr. Hill referred to hourly employees as "Aunt Sallies and Uncle Johns," the evidence does not support this contention. Furthermore, contrary to plaintiff's assertion, there is no evidence beyond plaintiff's own testimony that Mr. Marriott refused to shake plaintiff's hand when he visited the Twin Bridges property. Mr. Hardy's testimony contradicts the testimony of the others present at the alleged incident and defies credibility.

## E. The Termination

Prior to his termination, plaintiff received from Mr. Gowman on January 22, 1975 a memorandum entitled "Various Deficiencies in Your Job Performance." Listed among plaintiff's shortcomings were the following: failure to complete proper reference checks on new employees; failure to effectively communicate and cooperate with members of the executive committee; failure to participate and communicate at weekly staff meetings; failure to initiate and implement personnel programs within the hotel aimed at keeping a high degree of employee morale on the property; and failure to keep the cost of employee recruiting down to a reasonable level. Mr. Gowman warned plaintiff that he expected immediate improvement.

Defendant was terminated from his position at Marriott on February 7, 1975 pursuant to a reduction in force ("RIF") at the management level. At the time of the discharge, Marriott's policy with respect to a RIF was to consider not only an employee's length of service but also his or her ability to perform. Mr. Ward made the final deci-

sion to terminate plaintiff based on Mr. Hardy's record which was the poorest among the personnel directors.[3] Mr. Hill also had input into this decision. Both gentlemen are black.

Contrary to plaintiff's assertion that he was not given an opportunity to move elsewhere within Marriott, the evidence at trial showed that in the spring of 1974 Mr. Hardy interviewed for an "In-Flight" position in Dallas, Texas, having been referred there by Mr. Hill who was actively seeking to promote blacks in the company. Although his initial interviews were promising, he was not offered the job in Dallas. At the urging of Mr. Hill plaintiff also interviewed for the Personnel Director position at the Philadelphia property. This position would have amounted to a promotion for plaintiff. The facility was twice as large as the Twin Bridges Marriott and the manager of the Philidelphia property wanted plaintiff to fill the position. Mr. Hardy was offered the job but rejected the offer.

Plaintiff was replaced by Frank Kadish (white male) who transferred from a Marriott hotel in Kansas City.[4] Mr. Kadish had been with Marriott longer and held a performance record superior to Mr. Hardy's. The Court credits Judy Abbett's assessment that Mr. Kadish was a better personnel director than plaintiff because he followed through on employee complaints and remedied the administrative reporting problems left by plaintiff. Ms. Abbett (white female) was an assistant to Mr. Hardy and then to Mr. Kadish, and later became a personnel director. There is no evidence that Mr. Kadish's race played any role in the decision to transfer him to the Twin Bridges property to replace plaintiff as personnel director. Indeed, Mr. Hill testified to several incidents where black personnel directors were replaced by other black individuals.

3. Plaintiff does not claim that Mr. Ward discriminated against him.

4. On the same day that plaintiff received the January 22 memorandum on his deficiencies, Mr. Kadish was informed that he was being

transferred to Washington, D.C. He was not told for which property he would serve as personnel director. Mr. Ward was responsible for Mr. Kadish's transfer.

Plaintiff's PAF of February 7, 1975 explained that "Bill is being terminated due to his poor job performance and the presence of a well-qualified replacement candidate within the personnel division who might otherwise be laid off due to management lay offs within the hotel division." Def. Exh. K. Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on April 3, 1975. The EEOC brought this action on August 27, 1981. On July 27, 1982, the Court granted Mr. Hardy leave to intervene as party plaintiff. On November 18, 1982, the EEOC settled its case with defendant.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this case pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

The familiar framework for analyzing a Title VII claim of disparate treatment divides the evidentiary burden into three parts. *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *Id.* at 802, 93 S.Ct at 1824; *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). Once a *prima facie* case is established, the burden of proof shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action. *Burdine, supra,* 450 U.S. at 254–55, 101 S.Ct. at 1094. "The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiffs." *Id.; see also McKenna v. Weinberger,* 729 F.2d 783, 788 (D.C.Cir.1984).

If the defendant meets this burden, the plaintiff may then prove, by a preponder-

ance of the evidence, that the defendant's articulated justifications are a pretext for discrimination. *McDonnell Douglas, supra,* 411 U.S. at 804–05, 93 S.Ct. at 1825. As the Supreme Court has explained:

> "The plaintiff retains the burden of persuasion.... [H]e may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." 450 U.S. at 256 [101 S.Ct. at 1095] ... In short, the district court must decide which party's explanation of the employer's motivation it believes.

*United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 715–16, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

■ To establish a *prima facie* case of disparate treatment and discriminatory discharge, Mr. Hardy must prove that: (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for and performed adequately in his position as personnel director; (3) defendant adversely affected plaintiff's employment and eventually discharged plaintiff; and (4) similarly situated persons, not of a protected class, were not similarly affected or discharged. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Jones v. Public Defender Service of the District of Columbia,* 553 F. Supp. 1031 (D.D.C.), *aff'd,* 720 F.2d 215 (D.C.Cir.1983).[5]

Mr. Hardy, a black male, is a member of a protected class. Plaintiff also introduced sufficient evidence concerning his qualifications and his originally above-average or average ratings to satisfy the second prong of the test. Plaintiff further has met the third and fourth elements of the *prima facie* test in that he demonstrated that he was discharged by Marriott and replaced as personnel director by a white male who is not a member of a protected class.

---

5. *McDonnell Douglas* acknowledges that the *prima facie* proof required in Title VII actions will vary according to the facts. 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. The Eighth Circuit has framed the fourth prong of the prima facie test such that: "after his discharge the employer assigned white employees to perform the same work." *Person v. J.S. Alberici Construction Co.,* 640 F.2d 916, 919 (8th Cir.1981).

Defendant, however, offers legitimate, non-discriminatory business reasons for its decision to terminate Mr. Hardy. Plaintiff has failed to show that the proffered reasons are pretextual and, thereby, has failed to carry his ultimate burden of proof.

As a legitimate, non-discriminatory reason for plaintiff's discharge, defendant submits that throughout his tenure at Twin Bridges plaintiff failed to timely finish assignments, cooperate with the other managers, initiate and implement a number of personnel programs, or participate in corporate programs. Indeed, the General Manager gave plaintiff a lengthy memorandum in January, 1975 listing the deficiencies in plaintiff's performance which had not improved over time. In scrutinizing the subjective evaluations, the Court must make sure only that the process and the criteria do not mask unlawful discrimination. *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 (1st Cir.1979); *Judge v. Marsh*, 649 F.Supp. 770, 781 (D.D.C.1986). There was no indication at trial that the PAFs were arbitrary, or that the weaknesses revealed in the appraisals were inaccurate, or that plaintiff's supervisors were motivated by racial animus. The negative evaluations Mr. Ward and Mr. Hill, both black, gave plaintiff further negate any inference of racial discrimination. *See Gray v. Frito-Lay, Inc.*, 35 F.E.P. 598 (S.D.Miss.1982) [Available on WESTLAW, DCT database]. Although plaintiff's PAFs gave him overall above-average ratings they were also replete with areas which needed improvement. Mr. Hill and Mr. Gowman, moreover, credibly testified that the "2" ratings were given in acquiescence to plaintiff's disapproval of a lower rating and his desire for a pay increase.

Plaintiff, in an effort to bolster his position, testified about all the projects he had successfully completed. Defendant does not dispute that Mr. Hardy contributed to the Twin Bridges or that he occasionally exhibited good management qualities. Plaintiff, however, had a tendency at trial to exaggerate his self-worth and his role at Twin Bridges. While plaintiff claims complete credit for developing and implementing "Rap It To The Man," other witnesses credibly testified that plaintiff improved a program already in existence. Plaintiff also contends that he single-handedly brought about the high response rate on the employee surveys; while he did contribute significantly to this endeavor he was also aided by the other members of the executive committee.

Plaintiff's strengths, however, do not create an inference that his discharge was racially motivated given the long list of problems plaguing his job performance. As one court in this Circuit found, despite the contradictions presented by an evaluation, "the preponderance of the credible testimony demonstrates that as a trainee ..., plaintiff fell short of expected standards and was not considered by his superiors a good management prospect." *Bobb v. Andrus*, 430 F.Supp. 522 (D.D.C.1977) (plaintiff discharged on a RIF). Similarly, Mr. Hardy's performance, as revealed by the testimony, undermines the "above-average" ratings he received. *See Meiri v. Dacon*, 37 F.E.P. 756, 759 (2nd Cir.) (court cannot look at job performance in a vacuum; it must consider whether it met the employer's legitimate expectations); *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed. 2d 74 (1985). Defendant introduced into evidence several incidents of plaintiff's insubordination. Plaintiff, for example, blatantly refused to participate in the "Train-The-Trainer" program even after directed by corporate headquarters to attend. Although plaintiff complained that Mr. Hill never completed a property audit with him, and spent little time trying to do so, Mr. Hill explained that he could not conduct such an audit because plaintiff never was prepared for one despite instructions to the contrary. Plaintiff, moreover, did not submit a proposed Personal Plan pursuant to his October, 1974 PAF. The Personal Plan plaintiff offered as proof that he had submitted such a plan related to the previous fiscal year. This fabrication was symptomatic of the evasive and untrustworthy nature of plaintiff's testimony throughout the trial.

Defendant, moreover, discharged plaintiff under a RIF. By all accounts he was replaced by an individual with seniority and a superior performance record. Ms. Abbet credibly testified that Mr. Kadish was the better personnel director. Mr. Ward, who had hired plaintiff, made the final decision to discharge Mr. Hardy and transfer Mr. Kadish to Twin Bridges. Mr. Ward is of the same race as plaintiff which makes any claim of racial discrimination suspect. Although in this instance a black personnel director was replaced by a white male, Mr. Hill testified to numerous other times when a black personnel director succeeded another black director.

Plaintiff claims that defendant violated Marriott's Standard Operating Procedures, EM–SOP–11, by failing to comply with all its requirements. Plaintiff, however, was not terminated for violating a rule, or committing a crime, and thus this procedure is inapplicable. Defendant discharged plaintiff in accordance with a RIF and, therefore, followed its RIF policy of evaluating the employee's length of service and his performance record. Mr. Hill and Mr. Ward credibly testified that plaintiff had the poorest record among the personnel directors. Plaintiff claims defendant could have or should have transferred him to another hotel or division. Mr. Hardy, though, had already rejected a transfer and promotion to Philadelphia. Failure to transfer him does not amount to racial discrimination, nor has plaintiff drawn a nexus between his race and his rejection for the "In-Flight" program in Dallas, Texas. It is not for the Court to decide whether the decision to discharge instead of transferring Mr. Hardy was advisable, rather "the issue here is whether discrimination occurred and, if so, whether that discrimination was a result of plaintiff's ... [race]." *Rogers v. McCall,* 488 F.Supp. 689, 695–96 (D.D.C.1980) (sex discrimination). Plaintiff's discharge "reflected only the subjectivity inherent in employment decisions." *Judge v. Marsh,* 649 F.Supp. at

781. The preponderance of evidence adduced at trial does not reveal that plaintiff's termination was based on his race.

Plaintiff also has failed to demonstrate that he was treated differently than other similarly situated personnel directors. Plaintiff's contentions about the poor performance records of white Marriott employees are not at issue as these individuals did not hold comparable positions to plaintiff's, nor did plaintiff establish that he was discharged instead of transferred as other employees had been because of his race.[6]

During his last two months at Twin Bridges, plaintiff began a business of his own separate from that of Marriott which also lends credence to defendant's claim that it had legitimate, non-discriminatory reasons for discharging Mr. Hardy. *See Sias v. G.E. Information Services,* 25 F.E. P. 1319, 1321 (D.D.C.1981) [Available on WESTLAW, DCT database] (plaintiff discharged for, *inter alia,* going into business on the side; plaintiff was looking for excuses to justify his own failures).

■ Plaintiff attempted to show that defendant's reasons were all pretextual by pointing to several alleged incidents of racial slurs. Mr. Hardy's testimony of the "handshake" incident with Mr. Marriott was incredible and contradicted by other witnesses. Plaintiff's demeanor belied his story. With respect to the three racial jokes told by members of the executive committee, they were isolated incidents in poor taste. While a few of plaintiff's colleagues may have been insensitive, the ethnic comments were not so numerous or opprobrious as to constitute racial discrimination in violation of Title VII. *See, e.g., Johnson v. Bunny Bread Company,* 646 F.2d 1250, 1257 (8th Cir.1981). Plaintiff, moreover, responded in a like-manner thereby adding to the dissonance. Although the Regional Personnel Director admits to using the term "super nigger," plaintiff must shoulder the blame for initiating its use. Plaintiff did not establish

---

**6.** Although there was evidence that Bert Smith, a black Personnel Director for Marriott, resigned partially because he was concerned that Mr. Hardy's termination was not in line with

company policy, this does not establish that plaintiff was treated differently than other similarly situated personnel directors.

any link between this derogatory phrase and his discharge. There was also no credible evidence offered to support plaintiff's contention that Mr. Hill inquired about plaintiff's rapport with the "Aunt Sallies and Uncle Johns."

In his initial interview, Mr. Hill did inquire about how well Mr. Hardy worked with white people. This inquiry surfaced in response to plaintiff's growing hostility toward the white Regional Personnel Director and as such did not contribute to any alleged disparate treatment. Any inquiries, moreover, about Mr. Hardy's family were merely friendly overtures to which Mr. Hardy appears to have been oversensitive. Again, plaintiff has failed to establish a racially charged atmosphere. Any hostility or difficulty Mr. Hardy may have encountered appears to have stemmed from personality clashes, and plaintiff's inability to work with the other members of the executive committee. It is evident from the record the plaintiff considered himself better than his superior, Mr. Hill, and continually clashed with him to the extent of deliberately disobeying his order, given well in advance, to attend the Dallas training program.

The preponderance of the evidence presented at trial does not indicate that plaintiff's status as a black individual contributed to defendant's decision to discharge him under the 1975 RIF. Defendant's explanation of the disputed events and the circumstances surrounding them is far more credible and coherent than plaintiff's version. During the lengthy trial the Court had the opportunity to clearly observe the demeanor of the witnesses on the stand, and to listen attentively to the tone of their voices and the content of their answers. Plaintiff's attitude, voice inflections, mannerisms, and evasive and biased answers undercut the veracity and reasonableness of his testimony in sharp contrast to the straightforward and credible testimony of defendant's witnesses.

Plaintiff has failed to carry the ultimate burden of demonstrating by the preponderance of the evidence that his termination as personnel director was based on race. An individual with more seniority in service and a better record replaced Mr. Hardy pursuant to company policies and procedures. "No good reason exists for allowing a nonqualified employee to invoke Title VII to cure deficiencies in his or her qualifications, or to immunize potentially serious defects on the worker's job profile." *Williams v. Boorstin*, 663 F.2d 109, 116 (D.C.Cir.1980), *cert. denied*, 451 U.S. 985, 101 S.Ct. 2319, 68 L.Ed.2d 842 (1981). The evidence is clear that plaintiff's personality, his failure to adequately perform and carry out orders, and his decision to start his own business all led to his termination. Judgment, therefore, shall be entered for defendant.

An order consistent with the foregoing conclusions accompanies this opinion.