Donald R. WARE, Plaintiff,

v.

Dr. James BILLINGTON, in his official capacity as Librarian of Congress, Defendant.

No. CIV.A.03–0676(ESH).

United States District Court, District of Columbia.

Oct. 26, 2004.

Camilla C. McKinney, Law Offices of Camilla C. McKinney, PLLC, Washington, DC, for Plaintiff.

Rhonda C. Fields, United States Attorney's Office, Washington, DC, for Defendant.

### MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiff Donald Ware, an African American male, alleges gender and race discrimination, as well as retaliation, by his employer of two decades, the Library of Congress, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Defendant has moved for summary judgment. For the reasons set forth below, the Court grants defendant's motion.

## BACKGROUND

Ware, who joined the Library in 1982, spent seventeen years performing classification work for the Library's Human Resources Services ("HRS") division. (Def.'s Ex. 2 at ¶ 5(a) (Myers Aff.).) For much of that time until 1999, Ware was the GS–15 level Chief of the Classification and Position Management Office in HRS, where he reported to the Library's Director of Personnel Ben Benitez, a Hispanic male.

In August 1999 plaintiff voluntarily took a detail or temporary assignment (*see* Details of Staff Members in Non–Bargaining Unit Positions, L.C.R.2010–15 § 2(A) (1996)) to the Combined Federal Campaign ("CFC"), where he remained until March 2000. While Ware was at CFC, Benitez retired and Teresa Smith, the new

Director of HRS as of June 1999, became Ware's supervisor at the Library. Smith, who is an African American female, was brought in during a "critical time in HR . . . to reinvent, reengineer, the HR Office. There were many problems with the organization." (Pl.'s Ex. 2 at 20 ("Smith dep.").) In autumn 1999 Smith implemented an interim reorganization of HRS, whereby the GS–15 Classification Chief position was unofficially eliminated; the classifications section, which consisted of only four employees, was merged into a new Operations section that was headed by a white female GS–15 manager, Nora Bardak. (Def.'s Ex. 1 at ¶ 2.) This interim reorganization remained in effect until October 2002. (Pl.'s Ex. 1 at 71 ("Ware dep.").)

During the course of his detail at CFC, Ware met on several occasions with Smith. They discussed the restructuring, as well as what Ware's role would be when he returned to the Library. While there is some dispute as to whether Ware wanted to return to his prior Classifications Chief position, it is undisputed that he declined reinstatement because he believed that resuming that position would constitute a demotion since he would no longer report to the HRS Director, and because the head of classifications would be categorized as GS–14, rather than a GS–15. (Ware dep. at 17; Smith dep. at 72.) Ware instead expressed interest in the Operations manager slot (Ware dep. at 17), but that position had already been filled by Bardak in October 1999 (Ware dep. at 20–21; Smith dep. at 87; Def.'s Ex. 6 at ¶ 11(4)), and when Ware returned from his CFC detail nearly half a year later in March 2000, Smith stated that in order to maintain continuity, she would not place him in the position. (Smith dep. at 87; Ware dep. at 24.) As an alternative, they discussed the possibility of Ware serving as Smith's special assis-

tant to work on special projects. (Ware dep. at 22.)

While Ware was on detail at CFC, Smith had become aware of allegations of sexual impropriety and mismanagement by Ware. (Def.'s Ex. 1 at ¶ 7.) The Hay Group, an outside consultant that was retained to evaluate the performance of the HRS divisions, validated Smith's concerns, ranking Ware's division as the worst in all of HRS in terms of "program management." (Pl.'s Ex. 14; Smith dep. at 139.) With respect to the allegations of misconduct, Smith consulted the Library Deputy General Counsel, Jesse James, Jr., an African American male, who opined that "Ms. Smith took my advice perhaps, in part, because she was new on the job and I was her legal counsel. She wanted to establish a new way of conducting business in HRS. She wanted to clean up the organization to make it more effective." (Def.'s Ex. 3 at ¶ 13.) Therefore, she followed the recommendation of James, who "told [Smith] the allegations [against Ware] sounded serious and that they were of such a nature that she could not ignore them. I further told her that even though the allegations arose under the prior head of HRS and could be considered stale, she had an obligation to determine whether or not the allegations were true. As the head of HRS, she was obligated to determine whether one of her senior managers had engaged in sexual acts in the office, whether positions were improperly classified and whether HRS might be subject to a claim of sexual harassment." (*Id.* ¶ 6.)

As a result of this advice, Smith decided that an investigation must be undertaken. (Smith dep. at 128.) Therefore, on the morning of March 6, 2000, when Ware returned from his seven-month detail, he was directed to see James. (*Id.* at 29–30.) Over the course of several meetings that week, James and Ware discussed the

pending investigation, the possibility that Ware might resign or retire in order to avoid an investigation, and plaintiff's options if he elected to remain with the Library. (*Id.* at 30–37; Def.'s Ex. 3 at ¶¶ 2–4.) "The investigation would have been halted only if [Ware] had decided to leave the Library." (Def.'s Ex. 3 at ¶ 4 (James EEO investigation responses).)

During his first few weeks back at HRS, Ware was not given any assignments, because James "thought he would resign or retire.... Thus, there was no point in assigning him tasks if he would be leaving the Library soon thereafter." (Pl.'s Ex. 3 at ¶ 3.) But Ware did not leave. Instead, on March 28, 2000, he filed an informal Equal Employment Opportunity ("EEO") complaint with the Library, alleging sex, race and age discrimination by Smith. (Pl.'s Ex. 5.) Six days later, on April 3, Smith requested that the Library Inspector General ("IG") investigate Ware. (Smith dep. at 129.) On April 28, 2000, Ware lodged a formal EEO complaint, which omitted the age discrimination charge. (Def.'s Ex. 6; Pl.'s Ex. 24.)

On September 12, 2000, the Acting IG reported that "Mr. Ware did not provide adequate supervision of staff and management of programs and activities of the Classification and Position Management Office ("CPMO") during Fiscal Years 1997 to 1999.... Also, Mr. Ware failed to ensure that classification actions were properly conducted and documented." (Def.'s Ex. 7 at 1.) Based on that twenty-nine page report, on October 30, 2000, Smith issued a Letter of Warning to Ware that denied him any managerial or supervisory duties within HRS. (Def.'s Ex. 8.) Ware submitted a rebuttal to the IG's report (Pl.'s Ex. 15), but in its response on January 22, 2001, the IG's Office identified only one misstatement in its September 2000 report, and therefore, with that one excep-

tion, IG staff reiterated that "our findings were factual and conclusions proper." (Pl.'s Ex. 17.) As for the inquiry into the charges of favoritism and sexual improprieties by Ware, the Library's Office of Investigations concluded that, because "[c]ertain issues involved matters that were alleged to have occurred many years ago, where it was difficult or impossible to establish facts," its results were inconclusive and did not substantiate serious misconduct by Ware. (Pl.'s Ex. 23; Def.'s Ex. 1 at ¶ 9.)

On March 26, 2001, Ware was detailed to the Library's Integrated Support Services ("ISS"), where he was to help with a reorganization; Ware remained with ISS until October 9, 2002. (Ware dep. at 52–54.)

While he was at ISS in early 2002, Ware applied for three positions within HRS. Ware qualified for interviews for the two job openings as Supervisory Human Resource Specialist, but a computer system that evaluated each candidate rejected Ware's application for the third position. (Ware dep. at 88–91.) According to Ware, his interview was rescheduled "about three" times; each time, one or another member of the interview panel was unavailable on account of car trouble or a sick family member. (*Id.* at 92; Def.'s Stmt. of Material Facts ("Def.'s Stmt."), Payne Aff. ¶ 5). Convinced that Smith would not give him fair consideration, Ware withdrew his name from consideration for the Supervisory Human Resource Specialist positions. (Ware dep. at 93–94; Def.'s Stmt., Payne Aff. ¶ 5 and attached email.)

Upon Ware's return to HRS from ISS in October 2002, Smith assigned him to what he considered to be an isolated and inferior office on the first floor. (Ware dep. at 55.) She also gave him three special project assignments. When Ware finally sub-

mitted a report for one of the three assignments in October 2003, a year after he had been given the task, Smith wrote him a counseling memorandum deeming the report unacceptable and refusing to grant him further annual leave until he successfully completed the project. (Ware dep. Ex. H.)

Even though Ware had not actually been performing the job of a HRS supervisor since his return from the CFC detail in 1999, during the interim reorganization he had remained classified as Chief of Classification at a GS–15 grade. (*Id.* at 71; Def.'s Stmt., Smith Aff. ¶ 10.) On November 30, 2003, plaintiff was reassigned to a new, non-supervisory HRS GS–15 position that Smith had created for him, Special Projects Coordinator, because Ware's previous position as Chief no longer existed under the now-final HRS reorganization plan. (Ware dep. at 71; Def.'s Stmt., Smith Aff. ¶ 10.) Contemporaneously, plaintiff had to lose his onsite parking privileges because he had officially lost his supervisory responsibilities. (Ware dep. at 71.)

A few days later, on December 4, 2003, one of Ware's psychiatrists told him that she thought he should take off from work because she believed he was on the verge of a nervous breakdown. (Ware dep. at 107.) Beginning the next morning, Ware took several weeks of sick leave, which Smith subsequently disallowed, declaring plaintiff Away without Official Leave ("AWOL") and docking his pay because the doctor who served as the Library's Health Service Officer (Dr. Charles) determined that the medical documentation that Ware had submitted did not justify the requested sick leave. (*Id.* at 107, 111; Def.'s Stmt., Smith Aff. ¶ 12.) Four months later, in April 2004, Ware retired from the Library. (Def.'s Stmt., Smith Aff. ¶ 1.)

In his complaint Ware alleges that defendant Dr. James Billington, in his official capacity as Librarian of Congress ("Library"), discriminated against him based on his race and gender in violation of Title VII (Count I). He also alleges that the Library retaliated against him for engaging in activities protected by Title VII (Count II). The Library has moved for summary judgment, contending that it took no adverse actions against Ware, and that he therefore has not made out a prima facie case of discrimination or retaliation. It likewise maintains that there is no causal connection between plaintiff's Title VII-protected activity and the Library's actions and therefore, no prima facie case of retaliation. In the alternative, the Library asserts that it had legitimate, nondiscriminatory reasons for any adverse actions it may have taken against plaintiff, and plaintiff has failed to show that these reasons were merely a pretext for a discriminatory and/or retaliatory animus.

## ANALYSIS

### I. Legal Standard

Under Fed.R.Civ.P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505; *see also Wash. Post Co. v. United States Dep't of Health and Human Servs.,* 865 F.2d 320, 325 (D.C.Cir.1989).

The nonmovant's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmovant must provide evidence that would permit a reasonable jury to find in her favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1241 (D.C.Cir.1987). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). "While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Calhoun v. Johnson*, 1998 WL 164780, at *3 (D.D.C. Mar.31, 1998), *aff'd*, 1999 WL 825425 (D.C.Cir. Sept.27, 1999) (citation omitted).

Title VII provides, in relevant part, that it is unlawful for an employer "to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color . . . ." 42 U.S.C. § 2000e–2(a)(1). Defendant seeks summary judgment as to plaintiff's claims of discrimination based on race and gender, thus triggering the application of the *McDonnell Douglas* three-part "shifting burdens" test. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

The *McDonnell Douglas* framework establishes "an allocation of the burden of production and an order for the presentation of proof." *St. Mary's Honor Ctr. v.* *Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Plaintiff has the initial burden of proving a prima facie case of discrimination by a preponderance of evidence. *Id.* at 506, 113 S.Ct. 2742. If he succeeds, the burden shifts to defendant to articulate some legitimate, nondiscriminatory reason for its actions. *Id.* Its burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also Hicks*, 509 U.S. at 509, 113 S.Ct. 2742 ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment.").

If defendant is successful, then "the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal citations and quotation marks omitted). At that point, plaintiff has the burden of persuasion to show that defendant's proffered nondiscriminatory reasons were not the true reasons for the employment decisions. *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089.

## II. Count I: Discrimination

### A. Prima facie case

The Court's initial task is to determine whether Ware has made out a prima facie case of race or gender discrimination. To succeed, plaintiff must show that "(1) [ ]he is a member of a protected class; (2)[ ]he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Brown v. Brody*, 199 F.3d 446, 452 (D.C.Cir.1999). It is undisputed that plaintiff is an African

American male, thereby satisfying the first prong. (Pl.'s Opp'n at 37.) The next question is: Did any of the Library's acts constitute an adverse action within the meaning of prong two?

■ While plaintiff correctly argues that adverse actions are not limited to those involving economic loss (Pl.'s Opp'n at 38), he misapprehends the law by arguing that an adverse action is *"any* employment decision taken by the employer regardless of whether that decision adversely affects a tangible economic loss." (*Id.*) (emphasis in original). This Circuit has never endorsed such an approach; on the contrary, it has explicitly rejected the notion that all personnel decisions with negative consequences for the employee satisfy the second prong of the prima facie case. *See Forkkio v. Powell,* 306 F.3d 1127, 1130–31 (D.C.Cir.2002). To count, the action must have had "materially adverse consequences affecting the terms, conditions, or privileges of employment or [his] future employment opportunities." *Brody,* 199 F.3d at 457. This means that actions imposing purely subjective harms, such as dissatisfaction or humiliation, are not adverse. *See Forkkio,* 306 F.3d at 1130–31; *see also Brody,* 199 F.3d at 457 ("Mere idiosyncrasies of personal preference are not sufficient to state an injury."); *Childers v. Slater,* 44 F.Supp.2d 8,

19 (D.D.C.1999) ("[C]onduct that sporadically wounds or offends but does not hinder an employee's performance does not rise to the level of adverse action."), *modified on reconsideration,* 197 F.R.D. 185 (D.D.C.2000); *Jones v. Billington,* 12 F.Supp.2d 1, 13 (D.D.C.1997) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.") (citation and quotation marks omitted).

Instead, there must be some objective harm: "a tangible change in the duties or working conditions constituting a material employment disadvantage." *Walker v. WMATA,* 102 F.Supp.2d 24, 29 (D.D.C. 2000) (citation and quotation marks omitted); *see also Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). Paradigmatically, this means discharge, but actions such as demotion, reassignment with significantly different responsibilities, or the loss of economic benefits can also count as adverse. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 808, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Russell v. Principi,* 257 F.3d 815, 819 (D.C.Cir.2001).[1]

---

1. Ware attempts to avoid the requirement of showing an adverse action by arguing that there was an "overall scheme to deny Mr. Ware his position and destroy his career" and therefore the Court should consider his list of alleged adverse actions "in [their] totality" as a "succession of events." (Pl.'s Opp'n at 40.) This is not the law in this jurisdiction for analyzing a discrimination claim based on disparate treatment or a retaliation claim. Rather, each alleged adverse action must be analyzed to determine if it constitutes an "objectively tangible harm." *See Brody,* 199 F.3d at 452, 457; *Russell,* 257 F.3d at 818–19. While the Court acknowledges that an adverse action is not required for making out a discrimination claim based on a hostile work environment, plaintiff has not alleged such a claim in his complaint, nor could he. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (workplace conditions must be so suffused with "discriminatory intimidation, ridicule, and insult" of such severity or persuasiveness as to alter the terms and conditions of employment) (internal quotation marks and citation omitted). To make out such a claim, it is not enough to merely show harassment, for "Title VII does not prohibit all forms of workplace harassment, only those directed at discrimination because of sex [or race]." *Stew-*

With these guiding principles in mind, the Court turns to plaintiff's litany of alleged adverse actions. Although plaintiff lists some twenty-three distinct adverse actions (*see* Pl.'s Opp'n at 40–43), the Court will group these by subject for ease of discussion. The first category consists of indignities the plaintiff suffered, including Ware's non-inclusion in the HRS employee directory that was created while he was away on detail (Pl.'s Opp'n at 40 # 3); plaintiff's non-inclusion in HRS' interim organizational chart that was also created while he was on detail at CFC (*id.* # 4); plaintiff's non-inclusion, nearly half a year before he returned to HRS from CFC, in a retreat of management-level HRS employees, at which the interim HRS reorganization was discussed (*id.* # 2); Smith's revocation of plaintiff's on-site parking privileges following his reclassification in November 2003 as a non-supervisory employee (*id.* at 43 # 20);[2] and plaintiff's placement, following his return from an eighteen-month detail outside of HRS, in an undesirable and dirty first floor office, even though most HRS GS–15s (including plaintiff prior to his detail) had sixth floor offices. (Def's Stmt., Smith Aff. ¶¶ 3, 6.) (Pl.'s Opp'n at 42–43 # 15–18).

■ Although these indignities may have "humiliated" Ware (*id.* at 43 # 18), they do not amount, either individually or collectively, to "tangible employment action[s]." *Brody*, 199 F.3d at 456; *see also Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir.2004) (holding that denial of parking permit, among other indignities, is not an adverse action). Put simply, "a 'bruised ego' is not enough." *Brody*, 199 F.3d at 457 (quoting *Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257) (internal citation omitted). Therefore, as to these alleged indignities, plaintiff has not demonstrated any adverse action, and they therefore do not help to establish a prima facie case of discrimination.

■ The second category consists of Smith's placement of Ware in non-supervisory roles following his return in March 2000 from his detail at CFC. Plaintiff complains that for a few weeks following his return from the detail, Smith gave him no work. (Pl.'s Opp'n at 40 # 1.) But this alleged slight is too transitory for a reasonable trier of fact to conclude that Ware suffered objectively tangible harm, since it did not materially affect either his future employment opportunities or the terms, conditions, or privileges of his current employment. *Brody*, 199 F.3d at 457. Plaintiff was paid throughout the period (Ware dep. at 39), and in any event, a gap of a few weeks before a supervisor gives an employee assignments is not the type of workplace issue Title VII can address.

*art v. Evans*, 275 F.3d 1126, 1133 (D.C.Cir. 2002). As discussed more fully in this Memorandum Opinion, plaintiff cannot make out a claim for hostile work environment. There is no basis for inferring that any allegedly offensive or disparaging conduct by the defendant was based on plaintiff's race or sex, or that the allegedly hostile treatment was so severe or pervasive as "to create an objectively hostile or abuse work environment—an environment that a reasonable person would find hostile or abusive ...." *Harris*, 510 U.S. at 21, 23, 114 S.Ct. 367 (must consider its severity, whether it is physically threatening or humiliating and whether it unreasonably interferes with an employee's work performance).

2. ISS, which manages parking at the Library, determines in accordance with Library regulations which employees qualify for parking privileges based on their title or supervisory responsibilities. (Def.'s Stmt., Smith Aff. ¶ 11.) Because after November 2003 Ware was no longer a supervisor and no longer held the title of Chief of Classification, he, like three other HRS GS–15 non-supervisory staff members, automatically lost his parking privileges. (*Id.*)

This Court is not a "super-personnel department that reexamines an entity's business decisions." *Fischbach v. District of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C.Cir.1996) (internal citation and quotation marks omitted).

■ Plaintiff also complains that, upon his return from CFC, he was not placed in the HRS Operations Chief position. (Pl.'s Opp'n at 41 # 6–7.) In his fall 1999 meetings with Smith, Ware had expressed interest in the job, which in HRS' interim reorganization was the closest approximation to his pre-detail position as Classifications Chief. (Ware dep. at 20–21.) However, since the job had been filled by Bardak nearly half a year before Ware even returned to the Library from CFC (*id.* at 21), there was no job vacancy, and plaintiff cannot make out a Title VII prima facie case. *See Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1152 (D.C.Cir.2004); *cf. Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 654 (D.C.Cir.2003) (offering job to candidate who is available to fill it and who persistently demonstrated interest in it does not show retaliatory animus by employer towards plaintiff whose expression of interest was stale). It is of no consequence that Smith had the theoretical authority to rotate Ware into the already-filled position; failure to do so does not amount to an adverse action.[3]

■ However, Ware's contention that he suffered objectively tangible harm from Smith's failure to give him any supervisory responsibilities following his return from CFC is more problematic. (Pl.'s Opp'n. at 40–41 # 1, 5–6, 8–9.) There is "no doubt that the removal of [plaintiff's] supervisory responsibilities constituted an adverse employment action." *Burke v. Gould*, 286 F.3d 513, 522 (D.C.Cir.2002). Plaintiff had left HRS in August 1999 as a supervisor and returned in March 2000 to a non-managerial position. Given the intervening departmental restructuring, a short gap in affording plaintiff supervisory responsibilities while a suitable new role for Ware was identified might not have risen to the level of an adverse action, but plaintiff was *never* given any supervisory role up through the time of his retirement. Plaintiff has thereby demonstrated that he

3. Ware contends that "Bardak was no more qualified than Mr. Ware for the position as she had no training or expertise in classification or staffing." (Pl.'s Opp'n at 10 (citing Smith dep. at 86–87 and Pl.'s Ex. 6 at 12–13 ("Powell dep.")).) However, the Court need not inquire into Bardak's qualifications, because this facet of plaintiff's case does not concern a failure to hire, but rather a failure to affirmatively remove another employee who already occupies the position plaintiff seeks. Moreover, plaintiff's argument that Bardak was only equally as qualified is legally insufficient, for the D.C. Circuit has held that, in a dispute involving relative job qualifications, discrimination will not be inferred absent a showing that plaintiff's qualifications were *far superior* to the successful candidate's. *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C.Cir.1998) (*en banc*); *Stewart v. Ashcroft*, 352 F.3d 422, 430 (D.C.Cir.2003). In short, it falls to plaintiff to address "the issue of *discrimination,* not to quibble about the candidates' relative qualifications." *Skelton v. ACTION*, 668 F.Supp. 25, 26 (D.D.C. 1987), *aff'd*, No. 87–5353, 1988 WL 156306, at *1 (D.C.Cir. May 12, 1988).

In any event, the fact that Bardak had little experience with classifications or staffing (which does not mean managing an office, but rather is a personnel task akin to classifications work (*see* Smith dep. at 87–88; Pl.'s Ex. 3)) hardly disqualified her from serving as HRS Operations Chief, which is a *managerial* role. As a manager, she relied on her staff to make individual classification decisions. (Powell dep. at 13.) Bardak was an experienced GS–15 manager who had previously been Chief of the Payroll division (Smith dep. at 65), which, along with classification, staffing, and technical services, was one of the four HRS specializations rolled into the new Operations division. (Pl.'s Ex. 3.)

suffered an adverse action when he was stripped of his supervisory responsibilities upon his return from CFC.

■ The third category relates to plaintiff's involuntary detail to ISS. (Pl.'s Opp'n at 42 # 14.) But "a plaintiff who is made to undertake ... a lateral transfer—that is, one in which she suffers no diminution in pay or benefits—does not suffer an actionable injury unless there are some other materially adverse consequences...." *Brody*, 199 F.3d at 457. *See also Childers*, 44 F.Supp.2d at 21 ("The plaintiff does not offer any evidence to suggest that her reassignment from an international program manager to the project leader ... had any corresponding negative effect on her salary, benefits, responsibilities, stature, or otherwise."); *see also Forkkio*, 306 F.3d at 1131. Because plaintiff's job at ISS was functionally equivalent to the role he had been performing in HRS (Ware dep. at 52), the temporary reassignment does not rise to the level of an adverse action.

■ The fourth category concerns Ware's withdrawal from the interview process for two HRS positions. He argues that "Smith block[ed] [him] from competing for [the] two ... positions by rescheduling his interview numerous times, causing [him] embarrassment and frustration such that he discontinue[d] the process." (Pl.'s Opp'n at 43 # 21). However, reading the evidence in the light most favorable to Ware, as one must do at this stage, the facts do not establish that Smith blocked Ware from competing. On one occasion Smith personally informed Ware that one of the outside interview panel members had not arrived, and therefore, the interview would have to be delayed. (Ware dep. at 93.) Moreover, the HRS Administrative Officer, who was responsible for coordinating the interview process, indicated that she does not recall Smith ever directing her to notify Ware that his interview was cancelled. On the contrary, the Administrative Officer had responsibility for cancelling and notifying interviewees when interview panel members did not show up, and indeed, in addition to Ware, most of the selectees from the interview process likewise had to be rescheduled at least once.[4] (Def.'s Stmt., Payne Aff. ¶¶ 4, 6.) Indeed, Ware admitted that Smith went out of her way to try to schedule further interviews for him, going so far as to search the building for him when an interview slot became available, and that HRS persisted in trying to set up further interviews with plaintiff. (Ware dep. at 93–94.) Those efforts stopped only when Ware formally withdrew his name from consideration. (Def.'s Stmt., Payne Aff. ¶ 5 and attached email.)

Ware's assertion that Smith blocked him from interviewing is therefore contradicted by the undisputed evidence that it was the HRS Administrative Officer (not Smith) who managed the process. That on one occasion others were interviewed later the same day that Ware's interview was cancelled shows nothing other than that plaintiff had bad luck, for he does not impugn the motives of the Administrative Officer, who was the one responsible for rescheduling Ware's interviews.

But even if the Court were to credit Ware's argument, he still does not make

---

4. As for Ware's rescheduled interviews, on one occasion Smith's mother was ill, and she could not come to work on the day of the interview. (Def.'s Stmt., Payne Aff.) Another time, an outside interview panel member's car broke down and Ware's interview had to be postponed (*id.;* Ware dep. at 92), although other candidates were able to be interviewed later that same day after the outside panel member arrived following Ware's scheduled 10 a.m. time slot. (Ware dep. at 94.)

out an adverse action, because rather than proceeding with the process in spite of his "embarrassment and frustration," he dropped out. To state a prima facie case for failure to hire, a plaintiff must show, *inter alia,* "that, despite his qualifications, he was *rejected." Teneyck,* 365 F.3d at 1150 (internal quotation marks and citation omitted) (emphasis added). Plaintiff was never rejected, because he withdrew. And the rescheduling of Ware's interviews did not affect the "terms, conditions, or privileges of [his] employment or [his] future employment such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." *Brody,* 199 F.3d at 457.

█ The fifth category involves Smith's instigation of an investigation of Ware when he refused to retire or resign upon his March 2000 return from the CFC detail. Again, an important part of Ware's argument is contradicted by the evidence. Plaintiff incorrectly contends that Smith started the investigation "despite the absence of any evidence, documentation, or even witnesses that he engaged in any wrongdoing." (Pl.'s Opp'n at 42 # 11.) The record shows that Smith had evidence as early as the fall of 1999 that warranted an investigation: several employees had complained of Ware's favoritism and stated that he was always behind closed doors with a white female employee whom he was dating and with whom he allegedly

had sexual intercourse at the office; and others faulted Ware for not providing training, supervision, performance appraisals or awards. "Morale was just generally low." (Smith dep. at 102, 105–07, 119.) [5] An outside customer satisfaction survey conducted for Smith by the Hay Group ranked the Classification Office as the worst division. (Def.'s Ex. 1 at ¶ 7; Pl.'s Ex. 14.) Smith herself noticed that the Office was in disarray, she encountered several classifications that "made no sense," and she discovered that "Ware had classified his own [position description.] Which is kind of a no-no." (Smith dep. at 139–40.)

Ware also misrepresents the record when he states that he was "essentially cleared of the unfounded allegations concerning mismanagement." (Pl.'s Opp'n at 42 # 12.) In fact, after considering plaintiff's rebuttal to the report, the IG Office concluded that the report contained but a single misstatement. "For the remainder of the report, [the Office] believe[d] that [its] findings were factual and conclusions proper." (Pl.'s Ex. 17 (email from Patrick Cunningham, IG Office, to Ware (Jan. 22, 2001)).) Thus, the Office's damning conclusions that "Mr. Ware did not provide adequate supervision of staff and management of programs and activities," and that he "failed to ensure that classification actions were properly conducted and documented" remained unaltered. (Def.'s Ex. 7 at 1.) [6] In short, the record shows that

---

5. Several female employees had in fact filed EEO complaints against Ware based on his alleged favoritism towards the employee he was dating. (*Id.* at 105–07.) While Smith was aware of the underlying allegations, she was not aware that EEO complaints had been filed in the past. (Def.'s Ex. 1 at ¶¶ 7, 16.)

6. Even plaintiff's contention that he was "completely cleared of all allegations concerning [sexual] misconduct" (Pl.'s Opp'n at 42 # 13) is not completely accurate; although the Office of Investigations found that the

allegations had not been substantiated, in the very next sentence the Office qualified what Ware misreads as an exoneration: "This [failure to substantiate the sexual impropriety allegations] may have been influenced by the amount of time that has passed since Mr. Ware's alleged misconduct, which may have been several years. Some important witness testimony is no longer available and certain critical documents are missing." (Pl.'s Ex. 23 at 2.)

Smith had more than adequate evidence to warrant an investigation of plaintiff's mismanagement and misconduct.

■ Moreover, the request for an investigation by an independent body (as opposed to the disciplinary action that may follow) does not constitute an actionable adverse employment action. *Haddon v. Executive Residence at the White House*, 313 F.3d 1352, 1363 (Fed.Cir.2002) (applying Title VII law); *Harrison v. City of Akron*, 43 Fed.Appx. 903, 905 (6th Cir. 2002) (unpublished); *Roney v. Ashcroft*, No. 01–0544, slip op. at 5 n. 1 (D.D.C. Aug. 6, 2002); *see also Mack v. Strauss*, 134 F.Supp.2d 103, 114 (D.D.C.2001), *aff'd*, 2001 WL 1286263 (D.C.Cir. Sept.28, 2001) ("mere investigations by plaintiff's employer cannot constitute an adverse action because they have no adverse effect on plaintiff's employment"). Therefore, although the discipline imposed as a result of an investigation may have a sufficiently adverse effect on plaintiff's employment to be actionable, the mere initiation of the investigation does not.

■ By contrast, the sixth category—Smith's written admonishments of plaintiff—does advance plaintiff's argument. Ware correctly argues that the October 30, 2000 Letter of Warning (Def.'s Ex. 8) that stripped him of supervisory responsibilities based on the IG's mismanagement report constitutes an adverse action, because it had the effect of "significantly diminish[ing] [Ware's] material responsibilities." *Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257 (quoting *Crady v. Liberty Nat. Bank &*

*Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir.1993)) (quotation marks omitted).[7]

■ However, the other written admonishment, dated October 30, 2003, was not an adverse action. It deemed unacceptable a report submitted by Ware ten months after the original due date, which deadline had already been extended at the last moment by four months in order to accommodate Ware's "use or lose" annual leave that was set to expire. (Ware dep. Exs. E, F, G.) Smith asserted that the "report" as submitted was not complete, because it was not "a report of several pages," it did not address numerous critical issues, and merely regurgitated information and priorities Ware had been informed of weeks earlier. The letter went on to state that "[u]ntil this report is complete, no annual leave will be approved." (Ware dep. Ex. H.)

Nor was the withholding of annual leave approval an adverse action, particularly where the foreseeable duration of the withholding was only two weeks while plaintiff finished the overdue assignment. *Griffin*, 356 F.3d at 829 (refusal to approve annual leave request is not an adverse action). And, of course, the counseling memorandum of October 30, 2003 standing alone (without the withholding of leave) is not an adverse action. *See Brody*, 199 F.3d at 458 & n. 11; *Russell*, 257 F.3d at 819–20 (low performance evaluation alone created no prima facie case even though it exposed plaintiff temporarily to being laid off pursuant to a reduction-in-force, because it amounted to an "unrealized risk of a future

7. Arguably, this adverse action is independent of Smith's failure to give plaintiff supervisory responsibilities when he returned from his CFC detail in March 2000, because Smith's affirmative act of issuing the Letter of Warning in October 2000, which apparently permanently denied Ware any supervisory responsibilities within HRS (Def.'s Ex. 8), could be differentiated from her prior failure to give plaintiff a managerial role between March and October on the basis that the October Letter of Warning was a formal action that had the effect of replacing the indefinite and informal post-CFC refusal to place Ware in a supervisory role.

adverse action" and was "too ephemeral to constitute an adverse action").

 The seventh category is Ware's loss of several weeks of pay in December 2003 when he took sick leave that was disallowed by Smith when she declared him AWOL.[8] (Pl.'s Opp'n at 43 # 22.) The corresponding effect on plaintiff's pay and benefits was not necessarily insignificant, and it therefore constitutes an adverse action. *See Brody,* 199 F.3d at 456 (quoting *Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257); *Forkkio,* 306 F.3d at 1131.

The eighth category relates to Smith's failure to institute a reduction-in-force ("RIF") that allegedly would have allowed Ware to take over Bardak's position as HRS Operations chief. (Pl.'s Opp'n at 41–42 # 10.) Between March 2000, when Smith returned to HRS from CFC, and November 2003, he retained the title of Classification Chief, and was designated as a supervisor on paper only. Nonetheless, at the same time Smith never allowed Ware to perform any managerial tasks. (*Id.* at 41 # 9.) Meanwhile, in the interim reorganization, Ware's pre-CFC job of Classification Chief had been unofficially renamed "Classification Group Supervisor" and was downgraded to a GS–14, which

position was filled by various longtime HRS employees. (*Id.* # 5; Def.'s Ex. 3; Smith dep. at 60; Powell dep. at .9–10.) Throughout the interim reorganization from October 1999 to October 2002, all HRS employees were detailed to their position on an interim basis, although paperwork for the details was only completed where an employee was being temporarily promoted. (Smith dep. at 57.) Upon his return to HRS, Ware was detailed to a position as Smith's special assistant, although Smith did not complete paperwork confirming this. (*Id.* at 170.) However, because Ware was not downgraded (*id.* at 166), *i.e.,* he retained his GS–15 designation, paperwork was not necessary.[9] (*Id.* at 64.)

According to Ware, he was disadvantaged because, through the extended use of details, Smith avoided carrying out a RIF, which would have forced the Library to allow him to "bump" Bardak from her job as HRS Operations Chief, because he had greater seniority. (Pl.'s Opp'n at 11.) Library regulations require a RIF where "permanent or indefinite positions [are abolished] resulting in the involuntary reassignment, transfer, change to lower grade, or separation of staff members from their positions." Policies and Procedures

**8.** Ware and Smith had previously established that Ware could not take annual leave until he finished his outstanding assignments. (Ware dep. at 106.) Instead, Ware decided to take sick leave, which requires no preapproval. (*Id.* at 107.) Over the course of several days he called Smith a few times and left messages indicating that he was sick. He took off from December 5th to the 17th. (*Id.* at 107, 110–11.) Smith wrote him a letter declaring him AWOL based on the Library's Health Service Officer's determination that the medical documentation Ware had submitted did not justify the requested sick leave. (*Id.* at 111; Def.'s Stmt., Smith Aff. ¶ 12.)

**9.** Ware again misconstrues the record when he states that "Mr. Ware [wa]s not given a detail to any position, managerial or other-

wise, within the new HR structure." (Pl.'s Opp'n at 41 # 8.) Although the interim reorganization organizational chart produced half a year before Ware returned from his CFC detail indicated no GS–15 role for Ware (Pl.'s Ex. 3), Smith testified that the chart was a "living document. It was something that was done at a point in time when Mr. Ware wasn't there. It could easily have been amended." (Smith dep. at 82.) Upon Ware's return, he in fact was detailed to the special assistant job even though admittedly this was not done officially, since it was not formally processed via paperwork as required by L.C.R.2010–15 § 5(B) (details longer than one month are to be formally processed via paperwork). (*Id.* at 170.)

in a Reduction–in–Force for Non–Bargaining Unit Staff Members and Staff Members in Bargaining Unit Positions in the Law Library, L.C.R.2021–2 § 2(A) (1981).

■ Plaintiff's argument fails, however, because he misunderstands the relevant RIF regulation. It provides for a series of sequential steps whereby a displaced employee is reassigned to a new position. Plaintiff wholly ignores the first step, which is the category where he belonged. That category prioritizes the use of vacant, same-graded positions before proceeding to any other category, such as displacing an employee from an occupied post. *Compare id.* § 7(B)(1) *with id.* § 7(B)(2). The only requirement for being placed into a vacant position is that the new job be at the displaced employee's "same competitive level,[10] or in a position for which the affected staff member qualifies and which is at the same grade as his/her current position." *Id.* § 7(B)(1).

This is precisely what happened to Ware. He was placed in a vacant position, namely GS–15 Special Assistant to the HRS Director, which was at his grade level and for which he, as a longtime senior-level HRS employee, qualified. In other words, even if Smith had instituted a formal RIF, which she did not need to because she was "not reducing numbers[,][n]o one was going to hit the street[,][n]o one was going to be down-

graded" (Smith dep. at 166) [11], Ware would have been placed in precisely the same position to which Smith assigned him upon his return from the CFC detail. As such, neither the failure to institute a RIF nor Smith's protracted use of unofficial details for all HRS staff during the interim reorganization constitutes an adverse action, because Ware would not have been "worse off after the personnel action than before it. . . . [And thus] [h]e has suffered no objectively tangible harm." *Currier v. Postmaster General,* 304 F.3d 87, 89 (D.C.Cir.2002) (rejecting Title VII RIF claim).[12]

Finally, plaintiff's assertion that "Mr. Ware retire[d] from the Library because Ms. Smith had destroyed his career" (Pl.'s Opp'n at 43 # 23) is conclusory and therefore fails to state an adverse action. *See* Fed.R.Civ.P. 56(e); *see also Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985).

In sum, of his laundry list of purported adverse actions, plaintiff has stated only three: (1) Smith's rescission of Ware's supervisory responsibilities upon his March 2000 return from the CFC detail, (2) Smith's October 30, 2000 letter permanently stripping him of supervisory responsibilities, and (3) Smith's docking plaintiff's pay for sick leave in December 2003. Being mindful that plaintiff's burden at this stage is not great, *see Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505, and because the evi-

10. Competitive level is defined as "all positions, occupied or vacant, which are (1) in the same series and grade as the affected staff member's current position, or (2) in a closely related series at his/her current grade. These positions shall be so similar in all important respects, as determined by the library, that the affected staff member might be reassigned or transferred to that position with no special training." *Id.* § 2(D).

11. Indeed, the restructuring had proceeded under the condition that it would be budget neutral and that no one would lose his or her

job or be downgraded, which Smith had pledged at the outset to the Deputy Librarian. (Def.'s Ex. 1 at ¶ 2.)

12. Moreover, plaintiff relies on an unsupported factual premise to argue that, even assuming there had been no vacant post pursuant to § 7(B)(1), he could have bumped Bardak via § 7(B)(2). There is, however, no record evidence that Ware had greater seniority than Bardak. (*See* Pl.'s Opp'n at 11 (failing to cite any record evidence for this fact); *id.* at 52 (same); Def.'s Reply at 8 n. 2 (noting lack of evidence).)

dence relied on to justify defendant's actions is also relevant to the third prong of plaintiff's prima facie case, the Court will assume that a prima facie case has been established as to these three actions and proceed to analyze whether defendant has met its burden of producing evidence that its actions were based on legitimate, non-discriminatory reasons and whether plaintiff has demonstrated that these reasons are pretextual. *See Waterhouse v. District of Columbia*, 298 F.3d 989, 993 n. 6 (D.C.Cir.2002).

## B. Defendant's Nondiscriminatory Reasons

At noted, defendant bears a burden of production to articulate some legitimate, nondiscriminatory reason for its actions. *Hicks*, 509 U.S. at 506–07, 113 S.Ct. 2742; *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. Rather, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions, which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *Hicks*, 509 U.S. at 507, 113 S.Ct. 2742 (internal citation and quotation marks omitted) (emphasis in original).

In terms of the first adverse action, Smith's failure to give Ware any managerial role upon his return from CFC in March 2000, Smith had been hired in June 1999 as HRS Director in order to "reinvent, reengineer, the HR Office [because] [t]here were many problems with the organization." (Smith dep. at 20.) As part of that restructuring of HRS, which occurred while plaintiff was on detail to the CFC, Smith instituted a reorganization whereby the GS–15 Classifications Chief position that oversaw only four workers (Def.'s Ex. 1 at ¶ 2) was subsumed into the responsibilities of the new HRS Operations Chief. (Def.'s Reply at 5.) By the time Ware returned from CFC in March 2000, Bardak had already been Operations Chief for half a year, and Smith wanted to maintain continuity by keeping Bardak in that role during a period of "[s]ignificant upheaval" in HRS. (Def.'s Mot. at 22 (quoting Pl.'s Opp'n at 6).) Because there was no managerial role available, it was agreed that Ware would serve as her GS–15 special assistant. (Def.'s Mot. at 22.)

As regards the second adverse action, the Letter of Warning that resulted in the revocation of Ware's supervisory duties, the Library claims to have based its decision on the IG's report that showed serious supervision and management problems in the Classification Office from 1997 to 1999 during Ware's tenure.[13] Defendant claims

---

**13.** The report's findings were consistent with prior evidence of Ware's mismanagement of the Classifications Office during the tenure of Smith's predecessor, Personnel Director Benitez. For instance, in a 1995 performance appraisal, Benitez rated Ware "minimally successful," stating that Ware's performance "*borderlines on unsatisfactory* because you have not held your subordinates accountable." (Ware dep. Ex. A at 1 (emphasis in original).) Benitez blamed Ware for creating a "major morale problem," and held him responsible for his "notorious" staff. (*Id.* at 2.) He also blamed Ware for not beginning

several "critical element" assignments that Benitez had given him. (*Id.*) He further relayed a staff member's accusation that Ware "play[ed] favorites with another person." (*Id.* at 1.)

In mid–1996, Benitez gave Ware a written mid-way performance appraisal for that year, in which Benitez stated that since the 1995 review, Ware's performance had declined from minimally successful to unsatisfactory. (Ware dep. Ex. B at 1.) He accused Ware of having "done [no]thing to train [his staff], develop them, or improve their performance. You have a staff morale problem, and I have

that the Letter and the decision to suspend Ware's managerial duties were appropriate in light of the report's findings.[14] (Def.'s Mot. at 24, citing *Ardrey v. UPS,* 615 F.Supp. 1250, 1269 (W.D.N.C.1985); *Martinez v. Henderson,* 252 F.Supp.2d 1226, 1241 (D.N.M.2002).)

As for the third adverse action, the Library maintains that it denied plaintiff's December 2003 sick leave request because Dr. Charles, the Library's Health Services Officer, deemed the medical documentation provided by Ware inadequate to justify the length of sick leave requested. (Def.'s Stmt., Smith Aff. ¶ 12.) Because the request for extended sick leave came just over a month after Smith told Ware he could not take annual leave unless he completed his October 2003 project report (Ware dep. at 106), the Library contends that it was reasonable for Smith to declare plaintiff AWOL for twelve days and dock his pay after Dr. Charles rejected his medical documentation. (*Id.* at 29–30.)

## C. Evidence of Pretext

Since the defendant has offered legitimate, nondiscriminatory reasons for its actions, the Court proceeds to the final step in the *McDonnell Douglas* analysis, at which point the presumptions and burdens of the framework fall away, and plaintiff has the ultimate burden of persuasion to show that a reasonable finder of fact could conclude that the defendant's proffered nondiscriminatory reasons are merely pretextual. *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097; *see also Morgan,* 328 F.3d at 651. Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. "It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. [H]e must show that the explanation given is a phony reason." *Fischbach,* 86 F.3d at 1183 (citation and internal quotation marks omitted).

Although Ware "strong[ly] belie[ves]" that Smith, an African American woman, had "a distinct dislike for black men in positions of authority" (Pl.'s Opp'n at 17; Def.'s Ex. 6 ¶ 11(4)), such an unsupported and conclusory statement is not evidence of pretext. *See Meiri,* 759 F.2d at 998 ("[S]uch conclusory allegations of discrimination are insufficient to satisfy the requirements of Rule 56(e).") (citing cases). Moreover, because Smith and Ware are of the same race, "any claim of racial discrimination [is] suspect." *Hardy v. Marriott Corp.,* 670 F.Supp. 385, 392 (D.D.C. 1987). And insofar as Smith's initiation of

---

no evidence that you are addressing the problem in any manner." (*Id.*) As regards a special assignment given to Ware, Benitez wrote: "You have done nothing in this regard, and therefore, your performance in this critical element borders on Unsatisfactory." (*Id.* at 2.) He concluded that without improvements, "you will be subject to demotion or removal from the Library." (*Id.*) By the end of 1996, although Benitez rated Ware successful, he continued to criticize Ware: "You are a manager and you still have not held your subordinates accountable.... Also, your staff is flat, demoralized, demotivated...." (Ware dep. Ex. C at 1.)

**14.** Even after the IG report, there was further criticism of Ware's performance by an official whose motives plaintiff has not impugned. After eighteen months on a detail at ISS in order to help that division restructure, the ISS supervisor sent Ware back to HRS on short notice, writing to Smith that "[w]e are just not getting the support needed from Donald, and neither I nor my staff have the time to continue to follow up with him, and pick up after him.... I hate to do this at this time, but I have no choice. The ISS actions are just not being managed well internally." (Def.'s Ex. 12.)

the investigation of Ware is alleged to have been motivated by animus, she was relying on James' advice, who can hardly be said to have intended to discriminate against someone of his same gender and race. *See id.* (Def.'s Ex. 3 at ¶¶ 6, 13.) In the absence of any direct evidence of a discriminatory motive, the Court will nonetheless address plaintiff's remaining arguments to determine whether he has offered any reasonable basis for inferring pretext.

■ Ware asserts that during the interim reorganization, "8 whites and/or females have been detailed to supervisory positions in HRS[,] [h]owever, only 2 black men have been afforded this opportunity." (Pl.'s Opp'n at 17; Def.'s Ex. 6 at ¶ 11(4).) However, plaintiff provides no data about the total number of pre-reorganization African American male supervisors. Without such comparative data, plaintiff's numbers are "meaningless." *See Anderson v. Group Hospitalization, Inc.,* 820 F.2d 465, 469 (D.C.Cir.1987); *see also Valentino v. United States Postal Service,* 674 F.2d 56, 70–71 (D.C.Cir.1982) (emphasizing importance of providing adequate comparative context when considering data in support of Title VII discrimination claims). Nor has plaintiff provided any relevant evidence from which a reasonable factfinder could conclude that the interim reorganization's structure systematically discriminated against black men. *See Bethea v. Comcast,* No. 02–1767, slip op. at 13 (D.D.C. filed Sept. 13, 2004).

■ Plaintiff also argues that, because the interim reorganization had the effect of placing a white woman, Bardak, in the managerial position he sought and which was most comparable to his former post as Classifications Chief, the reorganization's effects support an inference of pretext. (Pl.'s Opp'n at 50–51.) However, plaintiff's argument is unpersuasive. The mere fact that a white woman occupies a job that came open and was filled at a time when plaintiff, because of his own voluntary detail outside the department, was not available to fill it, does not show pretext. *Cf. Harding v. Gray,* 9 F.3d 150, 152 (D.C.Cir. 1993) (plaintiff's prima facie case requires showing that the position applied for was available). As established above, Smith had no obligation to displace an existing employee, particularly where she sought to maintain continuity while she carried out a thoroughgoing restructuring of HRS. (Smith dep. at 87; Def.'s Ex. 1 at ¶ 14.) Furthermore, although Library regulations provide that employees away on detail remain "officially in [their] regular position[s]" (*See* L.C.R.2010–15 § 2(A)), the regulation does not preclude a reorganization during the time when the employee is away. Moreover, throughout the interim reorganization, plaintiff remained officially in his regular position, since he maintained his GS–15 Chief of Classification job title until November 2003, and therefore, the cited regulation appears to have no relevance.

Ware next attacks the Library's explanation why Smith issued the October 2000 Letter of Warning, which formally rescinded his supervisory duties. He contends that the IG's findings did not justify that penalty, and indeed the IG's report supposedly should have compelled Ware to permit him to "resume his duties." (Pl.'s Opp'n at 57.) As previously discussed, Ware inaccurately asserts that the IG's investigation "substantially cleared [his] name" and that the findings were "inconsequential." (*Id.*) But more importantly, Ware's argument entirely misses the mark, as he in fact concedes. (*Id.* at 18, 23 ("[T]his Court is not in the business of second-guessing the Library's decisions.").)

The question is not whether the report may have been flawed in some respect, but rather whether Smith honestly believed that the report warranted the rescission of Ware's supervisory duties. *See Smith v. Chamber of Commerce of the U.S.,* 645 F.Supp. 604, 608 (D.D.C.1986) ("[P]laintiff's perception of himself, and of his work performance, is not relevant. It is the perception of the decisionmaker which is relevant."). "Once the employer has articulated a non-discriminatory explanation for its action, . . . the issue is not the correctness or desirability of [the] reasons offered [but] whether the employer honestly believes in the reasons it offers." *Fischbach,* 86 F.3d at 1183 (quotation marks and citation omitted). *See also Gleklen v. Democratic Congressional Campaign Committee,* 199 F.3d 1365, 1369 (D.C.Cir.2000) ("Whether the activity level actually increased is not the critical question. [Plaintiff] needed to—but did not—refute [defendant's] evidence showing that those in charge . . . reasonably believed that its activity would increase when they asked [plaintiff] to resume a full-time schedule and later terminated her for rejecting that request.").

 As shown above, the IG's report revealed a clear pattern of mismanagement and inadequate supervision when Ware was Classifications Chief. (Def.'s Ex. 7 at 1.) Importantly, the investigation was not performed by Smith, the alleged discriminator, but rather by employees of the IG's Office, whose motives have not been impugned. Furthermore, although plaintiff attacks Smith for failing to modify the Letter of Warning in light of his rebuttal (Pl.'s Opp'n at 42 # 12; Def.'s Ex. 10),

her inaction is supported by the IG's subsequent determination that, except for one misstatement, the report was "factual and [its] conclusions proper." (Def.'s Ex. 11.) In sum, the Library's explanation that, both initially and following Ware's rebuttal, it reasonably relied on the IG's report in denying Ware any future HRS supervisory role stands unrebutted, and plaintiff's quibbles with the accuracy or thoroughness of the IG's report simply do not constitute evidence of pretext.[15] *See Waterhouse,* 298 F.3d at 995.

Plaintiff further contends that Smith's circumventing of Library regulations, combined with a series of other inconsistencies, shows pretext. These actions consist of the three-year delay in finalizing the interim reorganization; the failure to institute a RIF when Ware's position was "abolished and downgraded"; and Smith's decision to investigate Ware "for actions that occurred years before her tenure when she had not a shred of reasonable evidence to support her allegations." (Pl.'s Opp'n at 56–57.)

The Court has already established that Smith had reasonable bases for beginning the investigation, including the Hay Group's report, employee complaints about Ware, and Smith's own observation of misclassified positions for which Ware was responsible. Moreover, Smith reasonably began an investigation that spanned a period prior to her arrival based on James' legal advice that it was her duty, as head of HRS, "to determine whether one of her senior managers had engaged in sexual acts in the office, whether positions were improperly classified and whether HRS

---

**15.** Moreover, any further actions by defendant that denied supervisory roles to Ware following the IG's September 1999 report or its January 2000 reaffirmation—such as plaintiff's November 2003 reassignment to a non-supervisory Special Project Coordinator job (*see* Pl.'s Opp'n at 50)—are likewise validated, absent a contrary showing of pretext that plaintiff has not made, by the Library's reasonable reliance on the IG's conclusions regarding plaintiff's job deficiencies. (*See* Def.'s Ex. 7.)

might be subject to a claim of sexual harassment." (Def.'s Ex. 3 at ¶ 6.)

As for Ware's contention that Smith's protracted use of details and the corresponding failure to institute a RIF show pretext because these actions deprived him of the opportunity to bump Bardak, the Court has already shown that any arguable procedural departure did not cause "objectively tangible harm," *Currier,* 304 F.3d at 89, because in any event, Ware had no right to bump Bardak. In light of this fact, it would make no sense to infer a discriminatory animus.

Moreover, Smith's failure to institute a RIF was explained by the fact that "[n]o one was going to hit the street[,][n]o one was going to be downgraded," and therefore a RIF was unnecessary. (Smith dep. at 166.) Instituting a RIF involves an exercise of an agency's discretion. *Mayo v. Hodel,* 741 F.2d 441, 443–44 (D.C.Cir. 1984); *cf.* 5 C.F.R. § 351.204 ("Each agency covered by this part is responsible for following and applying the regulations in this part when the agency determines that a reduction [in] force is necessary."). Smith reasonably exercised her discretion in determining that, because no employee would suffer any adverse consequences from the interim reorganization, a RIF was unnecessary. *See Currier,* 304 F.3d at 89; *cf. Mayo,* 741 F.2d at 443 (in non-Title VII context, construing 5 U.S.C. § 7701(c)(1)(A) in Merit Systems Protection Board appeal as excluding an employee's claim, even where the employer agency conceded that it improperly failed to follow RIF regulations, because plaintiff could not "show the Department's error to have been harmful").

Moreover, even if it could be argued that the Library failed to follow its procedures,

that failure in and of itself would not constitute evidence of discrimination. "[A]n employer's failure to follow its own regulations and procedures, alone, may not be sufficient to support the conclusion that its explanation for the challenged employment action is pretextual. When an employer's departure from the prescribed procedure has become the norm, that departure lends no support at all to the plaintiff's inference that the employer's departure is a pretext." *Mungin v. Katten Muchin & Zavis,* 116 F.3d 1549, 1556 (D.C.Cir.1997) (quoting *Fischbach,* 86 F.3d at 1183) (internal quotations and other citation omitted). *See also Barbour v. Browner,* 181 F.3d 1342, 1347 (D.C.Cir.1999).

Here, the Library's failure to complete paperwork (SF–50 forms) for each detailed employee during the HRS interim reorganization had become the norm throughout its three-year span; only in cases of temporary promotions were such forms used. (Smith dep. at 57.) The use of details for an extended time beyond that envisioned by L.C.R.2010–15 § 4(B) [16] was likewise the norm for all HRS employees during the reorganization. (Smith dep. at 56–57.) Thus, departure from procedures was the norm during the interim reorganization, and the fact that Ware, like many of his colleagues, was not formally detailed (*see id.* at 170) over a period of several years does not support an inference of discrimination. At most, it shows that Ware, like every other HRS employee, had to wait until the reorganization was final in order to compete for HRS managerial jobs. (Def.'s Ex. 1 ¶ 14.)

▮ Similarly, even assuming *arguendo* that a RIF *was* necessary, because the departure from L.C.R.2021–2 § 2(A) (gov-

---

**16.** Pursuant to L.C.R.2010–15 § 4(B), details are limited to 120-day increments, extendable up to a maximum of one year unless the Librarian of Congress approves further extensions.

erning when a RIF must be invoked) had become the norm and affected all HRS employees equally, any such deviation does not show pretext. That is, had any positions been eliminated without the corresponding creation of vacant same-grade jobs for which displaced workers qualified, *see* L.C.R.2021–2 § 7(B)(1), other HRS employees would also have been disadvantaged, regardless of race or gender, by the unavailability of RIF bumping rights. *See id.* § 7(B)(2). But again, in actuality no employee *was* displaced without being placed in a suitable alternative role (Smith dep. at 166); thus, determining whether Smith's exercise of her discretion to not invoke a RIF could be classified as a technical failure to follow procedures is of no moment, for Smith reasonably concluded that a RIF was unnecessary in light of the fact that the reorganization was position neutral, *i.e.*, no one was being downgraded or fired.

■ As for the third adverse action, the disallowance of Ware's December 2003 sick leave and the subsequent docking of his pay, plaintiff offers no evidence to cast doubt on the Library's nondiscriminatory explanation that its Health Service Officer reviewed the proffered medical documentation and found it to be unacceptable. It is reasonable for a supervisor to seek the advice of a health professional in circumstances such as these, and there is no evidence that the decision to disallow sick pay was motivated by any discriminatory animus.

It may well be, as suggested by plaintiff, that Smith's "ultimate goal [was to] forc[e] Mr. Ware to relinquish his supervisory position" (Pl.'s Opp'n at 55), but the motivation for this was not race or gender discrimination. There was more than ample independent evidence that plaintiff was a bad manager. The Hay Group, the IG's Office, and Ware's subordinates all said so.

Smith's own observations, as well as those of her predecessor (Benitez), confirmed it. Similarly, Ware's inability to satisfactorily complete special projects had been documented. In Ware's performance evaluations, former HRS Director Benitez highlighted this failing. The director of ISS sent Ware back because he was not getting the job done. Smith's own experience as Ware's supervisor showed her that, even after a year, plaintiff could not successfully complete an assignment that was originally supposed to take at most three months. Put simply, there were more than sufficient reasons for Ware's supervisors to view him as a poor performer and to conclude that he could not do the job. Plaintiff has therefore failed to establish that his " 'employer's proffered explanation[s][are] unworthy of credence." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089). Accordingly, defendant is entitled to summary judgment on Count I.

### III. Count II: Retaliation

The Court now turns to plaintiff's retaliation claim. "The *McDonnell Douglas* framework is also applicable to claims of retaliatory dismissal." *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir.1984). In determining whether plaintiff has made out a prima facie case of retaliation, plaintiff must now show "(1) that [ ]he engaged in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two." *Brody*, 199 F.3d at 452 (internal citation and quotation marks omitted). Again, it is undisputed that plaintiff satisfied prong one by filing his EEO complaints on March 28 and April 28, 2000, and by filing this lawsuit on March 12, 2003.

Because the adverse action prong for retaliation is the same as that for a dis-

crimination claim, the Court adopts its earlier discussion regarding adverse actions. Thus, both the October 30, 2000 Letter of Warning and the docking of plaintiff's pay following the disallowance of his December 2003 sick leave constitute adverse actions for purposes of plaintiff's retaliation claim. However, because the March 2000 refusal to give Ware supervisory responsibilities preceded plaintiff's protected activity, that refusal does not constitute a retaliatory adverse action.[17]

■ Having identified two adverse actions, the Court must inquire whether a causal connection existed between the protected activities and the adverse actions. *See Brody*, 199 F.3d at 452. It is well established that, where an employer knew of the employee's protected activity, "very close" temporal proximity between a protected activity and an adverse action suffices to show a causal connection between the two. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing with approval cases finding temporal proximity of four and three months insufficient to demonstrate a causal connection); *Cones v. Shalala*, 199 F.3d 512, 521 (D.C.Cir. 2000); *Broderick v. Donaldson*, 338 F.Supp.2d 30, 38 (D.D.C.2004).

■ Plaintiff's arguments again miss the mark by focusing on the Library's initiation of an investigation six days after plaintiff filed his informal EEO complaint. (Pl.'s Opp'n at 48.) However, Smith and James testified that they did not know of the complaint when Smith contacted the IG on April 3, 2000. (Pl.'s Ex. 24 at 2

(EEO report).) More importantly, because the initiation of the investigation is itself not an adverse action, its close timing is of no consequence. Moreover, even if it were considered an adverse action, the temporal proximity to plaintiff's March 28, 2000 EEO filing would not make out a causal connection, because, as James told plaintiff on March 9, 2000 (Ware dep. at 34), they had already decided to request an investigation of plaintiff, but it was postponed in order to give Ware time to consider his options. (Def.'s Ex. 3 ¶ 4 (James EEO investigation responses) ("The investigation would have been halted only if the Complainant had decided to leave the Library.").)

■ With respect to the October 30, 2000 Letter of Warning, it came more than seven months following plaintiff's informal (March 28) and six months after his formal (April 28) EEO complaints. Given the passage of so much time, combined with the intervening September 2000 issuance of the IG's report criticizing plaintiff's management skills, there can be no causal connection between plaintiff's EEO complaints and the Letter of Warning. *See Salvadori v. Franklin School Dist.*, 221 F.Supp.2d 957, 962 (E.D.Wis.2001) (finding no causal connection where, in addition to an intervening parent complaint, there was a three-month delay between a teacher's EEO complaint and the initiation of heightened monitoring by supervisors). In short, the Letter followed and was caused by the IG report, not by plaintiff's earlier filing of his EEO complaints.[18]

---

**17.** Of course, the refusal had ongoing effects that persisted beyond plaintiff's EEO filings, because plaintiff was never given any managerial duties. But because defendant took no new material action related to that refusal after plaintiff engaged in protected activity (other than the October 2000 Letter of Warn-

ing), those continuing effects do not suffice to state a retaliatory adverse action.

**18.** Of course, it is also arguable that defendant's treatment of plaintiff did not change after he had filed his EEO complaint, since he had already been informally stripped of all

The second adverse action, the docking of plaintiff's pay as a result of the disallowance of his request for sick leave in December 2003, occurred more than nine months after the filing of this lawsuit on March 13, 2003, and half a year after a court appearance on June 26. (Ware dep. at 70–71.) Again, this time lapse precludes a finding of a causal connection.[19]

As a consequence, plaintiff has failed to state a causal connection between either adverse action and his protected activities, and thereby fails to establish a prima facie case of retaliation. Accordingly, the Court grants summary judgment as to Claim II.[20]

## CONCLUSION

For the foregoing reasons, plaintiff has failed to meet his burden for showing either discrimination or retaliation. Accordingly, defendant's motion for summary judgment is granted. A separate Order accompanies this Memorandum Opinion.

## *ORDER*

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** defendant's motion for summary judgment [# 14] is **GRANTED**; and it is

**FURTHER ORDERED** that this case is dismissed with prejudice.

**This is a final appealable order.**

---

managerial responsibilities prior to engaging in any protected activity.

19. Plaintiff also argues that the October 30, 2003 admonishment that withheld approval for annual leave pending successful completion of the October 2002 assignment was causally connected to Ware's protected activities involving this lawsuit. (Pl.'s Opp'n at 50.) As previously established, the admonishment did not constitute an adverse action, and therefore, the Court need not reach the issue of causation. But even if it did, there was no such connection. Plaintiff notes that he filed his complaint on March 13, 2003, and appeared in court on June 26. (Ware dep. at 70–71.) Regardless of whether either of these litigation events was sufficiently close in time to the letter of admonishment, an intervening event—namely plaintiff's submission of the project report three days before Smith's letter (Ware dep. Ex. H.)—was most assuredly the cause for the admonishment, rather than his exercise of any protected activity. *See Salvadori*, 221 F.Supp.2d at 962.

20. Even if plaintiff could state a prima facie case of retaliation, as previously explained, plaintiff has failed to show that defendant's nondiscriminatory reasons for the adverse actions are pretextual. (*See supra* Section II(C).) Therefore, summary judgment on Count II would be warranted on this basis as well.